(No. 17367.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM T. RUSSELL, Plaintiff in Error.

*Opinion filed June 16, 1926—Rehearing denied October 12, 1926.*

1. CRIMINAL LAW—*when defendant must prove circumstances in mitigation of homicide.* In a prosecution for murder, where the killing of the deceased by the defendant is proved, the burden of proving circumstances in mitigation of or justification or excuse for the homicide devolves on the defendant, unless the proof on the part of the prosecution manifests that the crime amounted only to manslaughter or that the defendant was justified or excused in committing the homicide.

2. SAME—*what necessary to reduce homicide from murder to manslaughter.* No words or gestures, however opprobrious, provoking or insulting, can amount to the considerable provocation which will so mitigate intentional killing as to reduce the homicide to manslaughter, but there must be both provocation and passion, and the provocation must be such as to incite irresistible passion in a reasonable person.

3. SAME—*when instruction defining murder and malice is not erroneous in ignoring defense.* An instruction properly defining murder and malice in the words of the statute is not erroneous in ignoring the defense of insanity in a murder trial, where the instruction does not direct a verdict and is not so worded as to mislead the jury.

4. SAME—*intent to kill is not part of definition of murder—instruction.* Intent to kill does not enter into the definition of murder, and on a trial for murder it is sufficient to prove an unlawful killing as defined in the statute, but the giving of an instruction that to prove the offense charged the intent alleged in the indictment must be shown and that it may be inferred from the facts and circumstances in evidence is not necessarily prejudicial to the defendant.

5. SAME—*court should compel observance of courtesy between opposing counsel.* The judge presiding over a trial has the power to require the observance of decent courtesy between counsel, the limitation of arguments within legitimate bounds and the avoidance of personal abuse, and should suppress any disregard of such requirements.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN McGOORTY, Judge, presiding.

Stewart & O'Brien, (William Scott Stewart, of counsel,) for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Robert E. Crowe, State's Attorney, and G. N. Nelson, (Edward E. Wilson, of counsel,) for the People.

Mr. Justice Dunn delivered the opinion of the court:

William T. Russell was tried at the November term, 1925, of the criminal court of Cook county on an indictment charging him with the murder of his wife, Mary, on August 28, 1925, and upon a verdict of guilty was sentenced to imprisonment in the penitentiary for fourteen years. He has sued out a writ of error to reverse this judgment.

Russell was fifty years old and had been a police officer of the city of Chicago for seventeen years. He had been twice married. By his first wife, who died in 1901, he had one child, Eva, who was three years old when her mother died. He married his second wife, Mary, in 1903, and by her had three children, William, who was fifteen years old, Marion who died at the age of twenty about six months before the homicide, and a third child who survived its birth only an hour. His hours of duty were from five o'clock in the afternoon to two o'clock in the morning. His wife had brought a suit against him for separate maintenance but had amended the bill so as to ask for a divorce. Pending this suit they were living in the house which had previously been their home at 4722 West Monroe street,— a building of two apartments, one above the other, the title to which they held jointly. They lived in the lower apartment, occupied separate rooms, and William, their son, also lived there. William testified that about 4:20 in the afternoon of August 28 his father, dressed in his police sergeant's uniform, was leaving the house, and his mother, in

the kitchen, seeing his father in the hall, said, "I wonder how Mrs. Hess likes the Keystone copper." Russell made an indecent answer and started to walk into the kitchen. His wife, seeing him coming toward her, walked hurriedly to the back porch, took up a pint milk bottle and stood at the door of the kitchen, saying to Russell, who was approaching her, "Now, don't you dare hit me." As Russell entered the kitchen William stood in front of him. His father threw him aside against the radiator. Mrs. Russell, seeing Russell coming toward her, ran out to the back porch and down the steps. The kitchen door was open and the screen door unhooked, and as she ran down the steps Russell, pulling out his revolver before he left the kitchen, ran after her and fired one shot. She screamed, and Russell ran down the steps and at close range fired a second shot. Mrs. Russell fell and the milk bottle in her hand was broken when it struck the sidewalk. The neighbors from next door came over to help her, and William went in to get some water and tried to call the police on the telephone but could not get a connection. He went out with the water to where his mother was lying. Father Ward, a priest, came, and with the assistance of Hennessy, a neighbor, and some others, she was carried into her bed-room and laid on the bed. While they were in the bed-room Hennessy said to Russell, who was there with his revolver in the holster, "Don't you think you'd better give me that gun?" and Russell said, "No; I think I can take care of it myself." He afterward handed it to Hennessy. The police came and asked who did this, and Russell said he did. Mrs. Russell was then taken out to St. Anne's Hospital, where she died a few minutes later.

Russell testified that he worked the night before, came home and slept a few hours, but could not sleep very well and got up and got his breakfast. Then he went to the cemetery to visit the grave of his daughter, as he was in

the habit of doing.  He got home at about two o'clock, lay down for a couple of hours, and then got up and put on his uniform to go over to the town hall at five o'clock to work.  On his way to the front of the house his wife called him.  He did not know exactly what she said, but he heard, "Mrs. Hess and the Keystone copper."  She called him to come back.  On hearing that remark he turned around and stood there and was going to say something to her, but thought what's the use.  Finally she said: "You yellow [using profanity] come back here.  If you think you got all the guns out of the house you're crazy. You wait a minute and I'll show you something.  Somebody will get killed here in a minute."  She was in the kitchen.  She started in the direction of the door and said, "Wait a minute and I will get you."  She started for the kitchen door leading out on the back porch.  Russell did not know just exactly what words were said.  He got excited and started toward the kitchen.  She jumped and grabbed a milk bottle on the back porch and said, "God damn you, I will use the milk bottle; even if you have got a gun, I will kill you with the milk bottle."  Russell tried to grab the milk bottle and she ran down-stairs.  He followed her, and when she got to the bottom of the stairs she swung around and hit him with the milk bottle.  He threw his head back and it went by the side of his face. She went against the fence, and as she straightened up she swung at him again.  Russell said, "Then I suppose it was then I fired; I don't know."  The force of the blow swung her around and she went against the fence, and when she straightened up she swung at him again.  "I did not have my gun out before she swung at me with the milk bottle. In going down-stairs I was in a hurry, and I had my gun in my holster here, and whenever I run or walk real fast I put my hand on it to keep it from jumping out of the holster.  I never intended to kill her.  I never intended to hit her.  The next time I saw her she was lying face down-

ward on the sidewalk. I don't recall just what I did. I believe I helped carry her into the house. When I saw that we were alone, she and I together, I figured it must have been I that done it, and I just went all to pieces."

On being taken to the police station the plaintiff in error made the following statement: "I hereby freely and voluntarily make the following statement: I was out to Mount Carmel Cemetery visiting my daughter's grave, whom I buried April 4, 1925, and returned home about two P. M. and I cooked some dinner and went to bed. I then got up and put on my police uniform to go to work at the Summerdale police station. About four P. M. I was just going out when my wife said, 'I wonder how his friends would like to see the Keystone copper.' I turned around and walked back to the kitchen and I said, 'I will give you a slap in the face.' She stepped on the back porch and got a milk bottle and said, 'Come out here and slap me.' I started out after her and lost control of myself and don't remember what happened. All I wanted to do was to take the milk bottle away from her. I don't know what possessed me to do anything else."

Mary Meyer testified that she lived right west of the Russells, and just before Mrs. Russell was shot she heard her scolding and went out on the porch and saw her with a milk bottle and heard her say, "I'll kill you." Mrs. Meyer then went in the house and then heard the two shots, one after the other. A number of witnesses testified to the good reputation of the plaintiff in error as a peaceable and law-abiding citizen.

John P. Hennessy, a captain in the fire department, who lived next door to the plaintiff in error, testified that he heard the two shots fired, ran out on the back porch and saw Mrs. Russell about ten feet from the bottom of the stairway leading from the first floor to the yard. He ran over and Russell was standing about six feet away with a gun in his hand. He had a wild look in his eye and Hen-

nessy thought he was insane. His eyes were popping out of his head and his face was quivering. Hennessy said, "God, Bill! What have you done?" and Russell replied, "She brought it on herself." Hennessy asked Russell to give him the gun or put it in his holster. He put it in his holster and helped carry his wife in. When they were inside Hennessy again asked Russell to give him the gun and Russell handed it to him. Hennessy's wife also went over to Russell's house and saw Mrs. Russell lying on the ground, face downward, and Russell standing a short distance from her with his revolver in his hand. As they started to carry Mrs. Russell in she saw Russell on the stairs and he was saying, "My God! Why did I do it!" He was excited, crying, putting his hands up to his head and begging her not to die and to come back, and went over to her, got a pillow and put it under her head. He looked wild-eyed and excited, went on his knees in the house, begged her to live and was crying bitterly, saying, "Why did I do it!" Mrs. Hennessy thought at the time he was a nervous wreck.

The People introduced evidence of discordant relations between the plaintiff in error and his wife, of quarrels between them involving the use of profane language and physical violence, of suspicions on her part of the impropriety of his relations with another woman, of circumstances tending in some degree to justify those suspicions, and of the bringing of the divorce suit a year or more before the homicide. The defense claimed was self-defense, but in view of the fact that the deceased was shot in the back twice by her husband while she was going down the steps, and all the other circumstances in the case, it is not surprising that the jury gave no credence to the defense. Based on the testimony of Mr. and Mrs. Hennessy, a claim of insanity is suggested and an instruction on that question was asked by the plaintiff in error and given, but clearly the evidence on the question was insufficient to raise a reasonable doubt of his guilt.

The killing of the deceased by the plaintiff in error having been proved, the burden of proving circumstances in mitigation or of justification or excuse of the homicide devolved on the plaintiff in error, unless the proof on the part of the prosecution manifested that the crime committed only amounted to manslaughter or that he was justified or excused in committing the homicide. No words or gestures, however opprobrious, provoking or insulting, can amount to the considerable provocation which will so mitigate intentional killing as to reduce the homicide to manslaughter. (*Jackson* v. *People,* 18 Ill. 269; *Steffy* v. *People,* 130 id. 98; *Friederich* v. *People,* 147 id. 310.) To reduce the homicide from murder to manslaughter there must be both provocation and passion, and the provocation must be such as to incite irresistible passion in a reasonable person. *Dacey* v. *People,* 116 Ill. 555; *Crosby* v. *People,* 137 id. 325; *Nowacryk* v. *People,* 139 id. 336.

Error is assigned on the giving of instructions. Instruction No. 1 concerned the duty of the jury in determining the credibility of witnesses, and after saying that the jury should consider all the circumstances under which any witness testified and enumerating various circumstances, concluded, "any circumstances that tend to shed light upon his credibility." While this instruction was too broad in not limiting the circumstances to be considered by the jury to those appearing in the evidence, yet in view of the testimony in this case the jury could not have been misled by it. *People* v. *Thompson,* 274 Ill. 214.

Instruction No. 12 defined murder and express and implied malice in the words of the statute. Objection is made to it on the ground that it ignores the defense of insanity, and the objection advanced, though not very clearly expressed, is that implied malice cannot exist where the perpetrator of the crime was so insane as to be incapable of mental action. This instruction did not direct a verdict.

It simply consisted of the definition of the crime and the malice which constituted one of the elements of the crime. It was not necessary that it should state anything further. The instruction has nothing to do with the question of insanity. That defense, so far as it had any basis in the evidence, was presented to the consideration of the jury in instruction No. 22 given at the request of the defendant, which was the only instruction on this subject asked by the defendant, and which informed the jury that if the defendant at the time he shot and killed the deceased was without sufficient mind or reason to know what he was doing, or that as a result of mental unsoundness he had not then sufficient will power to govern his actions by reason of some insane impulse which he could not resist or control, the jury should find the defendant not guilty because of insanity. The jury could not have been misled by the definition of implied malice.

Instruction No. 16 is a copy of sections 143 and 144 of the Criminal Code, with the addition that "one cannot be found guilty of manslaughter if you do not believe from the evidence beyond a reasonable doubt that the party charged had sufficient mental ability to be held responsible for his acts or if he killed by misadventure or was justified, and you are referred to other instructions given you upon those matters." Instruction No. 14 states the penalty for manslaughter. There was nothing in the case which justified the giving of any instruction in regard to manslaughter. If the defendant was guilty of any crime it was murder. If he was insane he was not guilty. The instructions in regard to manslaughter, however, were not harmful to him.

Instruction No. 15 states that to constitute the offense charged in this case the intent alleged in the indictment must be shown, but direct and positive testimony is not necessary to prove the intent; it may be inferred from the facts and circumstances shown in the evidence. Intent to

kill does not enter into the definition of murder, and on the trial it was sufficient to prove an unlawful killing. (*People* v. *Heffernan*, 312 Ill. 66; *Adams* v. *People*, 109 id. 444; *People* v. *Guido*, 321 id. 397.) As was said in the last case, the error in the instruction could not prejudice the defendant.

There remains to be considered the assignment of error that the conduct, remarks and argument of the assistant State's attorney who tried the case were of so prejudicial a character as to deny the defendant a fair trial. The assistant State's attorney seems to have regarded the trial as a personal combat between counsel and any weapon or method of attack legitimate, instead of a judicial investigation of the truth of a charge of crime by the orderly process of the law. He asked of the plaintiff in error, on cross-examination, incompetent questions reflecting by innuendo upon the character of his daughter and his own record as a police officer. He appealed in his argument to the prejudices of the jury by making vehement personal attacks on the character of the counsel for the plaintiff in error, whom he denounced for base and dishonorable conduct, not in this case or as shown by the evidence, but in general. He charged opposing counsel with using the old tactics of exciting the prosecutor to make remarks which the Supreme Court would say were unwarranted and prejudicial, for which that court would reverse the judgment and say that the prosecutor went out of bounds in his zeal to win the case. Objections made to his argument were usually sustained by the court, but the offenses were repeated and the dignity of the trial was destroyed. The judge presiding over a trial has the power to require the observance of decent courtesy between counsel, the limitation of arguments within legitimate bounds and the avoidance of personal abuse, and should suppress any disregard of such requirements. Had the record been such that the jury could reasonably have reached any other verdict than guilty of

murder the misconduct in the trial which has been mentioned would have required the same result as similar conduct in *People* v. *Bimbo,* 314 Ill. 449, and *People* v. *Black,* 317 id. 603. The guilt of the plaintiff in error is, however, so clearly established that the judgment must be affirmed.

*Judgment affirmed.*