(No. 20406.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES A. WILSON, Plaintiff in Error.

*Opinion filed December 18, 1930—Rehearing denied Feb. 4, 1931.*

C. E. McNemar, and A. G. Harris, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Russell O. Hansen, State's Attorney, and John P. Madden, for the People.

Mr. Commissioner Partlow reported this opinion:

Plaintiff in error, James A. Wilson, (herein referred to as the defendant,) was convicted in the circuit court of LaSalle county under an indictment charging him with an assault with a loaded revolver upon Amos Elliott with intent to kill and murder. He was sentenced to the penitentiary, and a writ of error has been prosecuted from this court to review the judgment.

There is very little conflict in the evidence as to the material facts. The defendant was five feet seven inches tall, was fifty-nine years of age and weighed 180 pounds. For over three years he had been the minister in charge of a church at Mendota, in LaSalle county. He testified that for two years prior to the event in question he had delivered five addresses every Sunday, and on account of his heavy duties, in December, 1929, his health became impaired and he suffered from nervousness, insomnia and kidney trouble. On December 17, 1929, he went to Chicago, consulted a physician and was put on a diet. He testified that while in Chicago he contemplated suicide and bought a 38-caliber revolver and a box of cartridges, which were sent to his home by express. Amos Elliott was the janitor of the church of which defendant was pastor. He was sixty-eight years of age and weighed 112 pounds. He lived at the southeast corner of Fifth street and Third avenue, in Mendota. The house faced north. There was a parlor in the northwest corner with a door on the north side opening onto a small porch. East of the parlor was the dining room, east of the dining room was the kitchen and east of the kitchen was a sewing room. There were doors connecting these four rooms. There was no outside door to the sewing room or the dining room but there were two outside doors in the

kitchen, one on the south and one on the north, which opened onto a small porch. On December 30, 1929, defendant wrote a letter to Emma Wagner, who was a widow and a member of his church. The letter is as follows:

"MENDOTA, ILLINOIS, *December 30th, 1929.*

"*My Dear Mrs. Wagner*—All I want is your forgiveness. Oh, if I could only recall those words that offended you they would never be spoken again. When I think of what I have meant to you, and of what I meant to John before his passing, and of how you feel towards me now, it almost kills me. It seems to be more than I can bear. No human being has ever suffered as I have suffered since discovering that my words offended you.

"This trouble has upset me so completely that I went to Chicago and consulted a physician, and while there I prepared myself to end it all, but when I think of the eternal destiny of my soul I shudder at the thought and fall on my knees before God and pray for His forgiveness and for strength to bear up and continue in His service.

"Now listen: I cannot get right before God until you freely forgive me. Won't you please do it? I confess that I made a mistake, even though what I said was said in the purest of motives, and since it offended you I beg that you forgive me and let us be just as we were before. I will never—no never—say anything to offend you again.

"I most earnestly request that you attend church and let me be the same old good pastor to you as in other days. If you will do that it will mean much to me, and if not, then I do not know how it will finally go with me.

"Your sorrowing friend,

WILSON."

On January 29, 1930, about 3:00 o'clock P. M., defendant learned from three members of his official board that Mrs. Wagner desired to complain to the official board concerning the conduct of defendant towards her, that she had given the letter in question to Mrs. Elliott with instructions that Mr. Elliott lodge a complaint with the church board, and that the Elliotts were showing the letter to members of the congregation and making remarks about the letter detrimental to the character of defendant. After defendant learned about the circulation of this letter he went to his home and called the Elliott residence by telephone. Elli-

ott answered the phone and defendant told him he wanted to see him. Defendant and his wife between 4:00 and 4:30 P. M. drove to the Elliott home in their automobile. They entered the house through the north kitchen door and went through the dining room into the parlor. Elliott then went out and fed his chickens. When he returned defendant told him he understood that he had a letter which he was showing to the people and said he would like to see it. Elliott replied that his wife, who was not at home, had the letter and he did not know where it was. He said his wife had gone calling and would return about 5:00 o'clock. Mrs. Wilson asked Elliott if he did not think he could find the letter, and he replied that he could not. Defendant said they would come back later, and he and his wife left the house and returned to their home. Defendant then went to his study, secured the revolver he had purchased in Chicago and loaded it with five shells. He placed it in his right overcoat pocket. He and his wife again went to the Elliott home about 5:00 o'clock in their automobile. The automobile was parked on the north side of the house and defendant and his wife entered the north kitchen door and went into the parlor. Defendant testified that he took the revolver with him on this occasion with the intention of committing suicide if he did not secure the letter. Elliott testified that defendant asked him if Mrs. Wagner was with Mrs. Elliott and he informed him that she was, and defendant said he would like to have seen them together. Defendant denies this last statement and says that the information with reference to Mrs. Wagner and Mrs. Elliott was volunteered by Elliott. In a few minutes Mrs. Elliott came home and entered the north kitchen door and came into the dining room. Her glasses steamed and she was obliged to clean them before she could see who was there. Defendant, his wife and Elliott went into the dining room. Defendant asked Mrs. Elliott if she had a letter, and she said she had. He said he would like to see it. Mrs. Elliott

went into the sewing room to get the letter. On her return she was met in the kitchen by defendant and his wife. Elliott remained in the dining room. Mrs. Elliott handéd the letter to defendant, who took it in his left hand, squeezeã open the envelope and determined that it was his letter and put it into his left-hand coat pocket and started for the north door. He testified he had the letter in his left hand and his left hand was in his pocket. Elliott testified that after defendant got the letter from Mrs. Elliott his left hand was not in his pocket but the corner of the letter was sticking out of the pocket, and that during the time the defendant was in the house he kept his right hand in his right overcoat pocket. As he started to leave the house Elliott took the letter from defendant's pocket, making the remark, "You're not going to get away with that." Defendant tried to snatch the letter from Elliott but did not succeed. Elliott backed into the dining room. Defendant drew his revolver and fired, striking Elliott on the left side, a few inches below the heart. The bullet was deflected by a rib and caused only a slight wound. After he shot Elliott he immediately whirled to the east and fired at Mrs. Elliott. This shot penetrated her left side near the heart, extended from the left breast to a point in the neck under the chin and passed out of her body and went through the open door. Two other shots were fired. One of them lodged above the door leading into the sewing room and the other entered the ceiling directly opposite the open kitchen door. Defendant testified that when Elliott snatched the letter everything went black; that Elliott appeared to him only as a shadow and he did not know he had fired any shots or had hit anybody. Mrs. Wilson grabbed her husband and told him to stop shooting. Mrs. Elliott, just as she was shot, ran out of the north door of the kitchen onto the street, calling for help. Elliott went out of the south kitchen door. Defendant followed Mrs. Elliott onto the north kitchen porch, where he broke the gun and the

shells fell on the ground. On the porch he asked his wife, "Have I shot them?" He left his wife at the Elliott home, rushed to his automobile and went to the home of Mrs. Wagner, but she was not at home. He testified that he went to her house to inform her that she had gotten them all into trouble and she should go and take care of the Elliotts. He next drove to his home. His wife had not yet returned. He testified that he re-loaded his revolver and got some fire insurance papers and gave them to his wife when she returned. He entered the vestibule as the chief of police came to the front door. He took off his glasses, laid them on a stand, and with the revolver in his right hand fired five shots at his head. The doctor who dressed the wounds testified that there were only two or three small abrasions on the right side of his head. The chief of police entered the house and took defendant to the hospital, where he was interrogated by the State's attorney concerning the affair.

Defendant insists that the verdict is not sustained by the evidence. In support of this contention it is urged that the relations between him and Mr. and Mrs. Elliott were always friendly; that when he learned that the letter had been made public he became deeply concerned; that he went to the Elliott home in a quiet and orderly manner and asked for the letter; that it was delivered to him and he had the lawful possession of it; that Elliott illegally and forcibly took it from him; that then the trouble arose between them and the shooting began; that Elliott was the first assailant and defendant fired in the heat of passion—in a fit of emotional insanity; that the revolver was bought a month before by him with suicidal intent and was taken by him to the Elliott home for that purpose; that the shooting could not have been premeditated, and that there was no malice, either express or implied.

Malice is a necessary element of murder and of an assault with an intent to commit murder. Malice may be

either express or implied. It includes not only anger, hatred and revenge but every unlawful and unjustifiable motive. It is not confined to ill-will towards an individual but is intended to denote an action flowing from any wicked and corrupt motive—a thing done with a wicked mind, where the fact has been attended with such circumstances as evince a plain indication of a heart reckless of social duty and fatally bent on mischief. Hence malice is implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart. (*Parsons* v. *People*, 218 Ill. 386; *McCoy* v. *People*, 175 id. 224; *Jackson* v. *People*, 18 id. 269.) Where the assault is committed deliberately and is likely to result fatally the malice required will be presumed. (*Crowell* v. *People*, 190 Ill. 508.) It is the deliberation with which the act is performed that gives it character. It is the opposite of an act performed under uncontrollable action which prevents all deliberation or cool reflection in forming a purpose. (*Davison* v. *People*, 90 Ill. 221.) It is not necessary that the party charged may have brooded over the intent or entertained it for any considerable time. It is sufficient if at the instant of the assault he intended to kill the party assaulted. It is sufficient if he is actuated in making the assault by that wanton and reckless disregard of human life that denotes malice and the assault is made under such circumstances that if death had ensued the killing would have been murder. (*Weaver* v. *People*, 132 Ill. 536.) Every sane man is presumed to intend all of the natural and probable consequences flowing from his own deliberate act, therefore if one voluntarily and willfully does an act the direct and natural tendency of which is to destroy another life, the natural and irresistible conclusion, in the absence of qualifying facts, is that the destruction of such person's life was intended. (*Dunaway* v. *People*, 110 Ill. 333; *Vandermark* v. *People*, 47 id. 122; *Perry* v. *People*, 14 id. 496.) If a sane person deliberately assaults another with a dan-

gerous weapon likely to produce death and the assault be such that if death resulted the crime would be murder, the express proof of the intent to murder is not required. (*People* v. *Haskins,* 337 Ill. 131; *Crowell* v. *People, supra; Crosby* v. *People,* 137 Ill. 325.) If a sane person fires a revolver at or towards another, either with malice aforethought or with a total disregard of human life, he may be convicted of an assault with intent to kill and murder the person so attacked. (*Conn* v. *People,* 116 Ill. 458.) Criminal intent may be manifested by circumstances connected with the perpetration of the offense without any positive testimony as to such intent. (*People* v. *O'Grady,* 339 Ill. 263; *People* v. *Yuskauskas,* 268 id. 328.) To constitute the criminal act one of voluntary manslaughter there must have been a serious and highly provoking injury inflicted upon the person assaulted sufficient to excite an irresistible passion in a reasonable person. (*People* v. *Ortiz,* 320 Ill. 205.) No mere words or gestures, however provoking or insulting, can amount to that considerable provocation which the law recognizes as necessary to reduce a killing from murder to manslaughter. (*Crosby* v. *People, supra.*) To reduce the homicide from murder to manslaughter there must be both provocation and passion, and the provocation must be such as to incite irresistible passion in a reasonable person. *People* v. *Russell,* 322 Ill. 295.

Defendant insists that the facts in this case are similar to the facts in *People* v. *Bissett,* 246 Ill. 516, where it was held that the defendant was not guilty of murder but could only be guilty of manslaughter. The facts in the two cases are not similar. In the *Bissett case* the deceased tried in a public place to take from the defendant his revolver and there was a scuffle between them and deceased was killed. In this case Elliott was in his own home. Defendant by false representations got possession of the letter, to which he was not entitled. There was no scuffle, Elliott was back-

ing away from defendant when he was shot, and there was no justification for the shooting.

It is not claimed that defendant was insane at the time the shots were fired, but it is claimed that on account of his physical and mental condition he fired the shots in a moment of emotional insanity. The mental and physical condition of defendant was established largely by his own testimony. The physician in Chicago who attended him in December, 1929, did not testify. The letter was the basis of the trouble. The meaning of the letter is not clear. Its meaning evidently depends on facts not contained in it. Defendant testified that his only offense against Mrs. Wagner was that he talked to her about living alone in her home with a boarder. It is apparent that, regardless of the facts which caused the letter to be written, defendant, when he learned that it had been made public, regarded the situation as so serious as to justify his getting possession of the letter in any way he could. Within a short time after learning of the facts about the letter he went to the Elliott home. The fact that he went to the Elliott home the second time with a loaded revolver creates a presumption against him. He attempts to explain this by stating that he purchased the revolver in Chicago for suicidal purposes and that he took it to the Elliott home with the intention of committing suicide if he did not obtain the letter. Both of these statements depend entirely upon his own testimony. He claims he went to the Elliott home on a peaceful mission, but he secured the letter from Mrs. Elliott under false pretenses. He told her he merely wanted to see it. His actions up to this time may have been peaceable but his subsequent actions did not indicate any such intention. Mr. and Mrs. Elliott were in their own home. They had not asked defendant to enter their house but he had come of his own accord. Mrs. Elliott was the legal custodian of the letter. Defendant had no right to take it away from her by force or under false representations. When Elliott took

the letter out of defendant's pocket he retreated from him into the dining room, therefore it cannot be claimed that the shooting was done in self-defense. Defendant was a younger and larger man than Elliott. He did not attempt to secure the letter after he shot. It cannot be contended that the shooting was justified under any legal theory. Defendant testified that when Elliott snatched the letter everything went black and he only saw Elliott as a shadow, but notwithstanding these facts he was a good enough marksman that he hit Mr. and Mrs. Elliott and missed his wife, who was between Mrs. Elliott and him. He claims the shooting of Mrs. Elliott was an accident. This contention is disproved by the fact that after the shooting he went out onto the porch and asked his wife, "Have I shot them?" This remark indicated that he knew he had shot at them and was aware of what was taking place. Mr. and Mrs. Elliott and Mrs. Wagner were the three parties whom he held responsible for his impending trouble. He was not in a very good frame of mind as to any of them. He evidently had Mrs. Wagner in mind during both of his visits to the Elliott home. After the shooting he rushed to the Wagner home. His explanation for so doing is not consistent with his other acts but it is consistent with an apparent intent to do Mrs. Wagner bodily harm because of her connection with the affair. It is claimed that at the time he went to the Wagner house he had no cartridges for his gun. This is a self-serving statement of defendant and depends entirely upon his own testimony. His attempted suicide after the shooting throws light upon the motive for the shooting. He knew the vital parts in his body through which a bullet would cause death. He fired five shots at his head with suicidal intent. Two of the bullets did not strike him and the others only caused slight scalp wounds. He had ample opportunity to kill himself if he desired to do so. The evidence does not show that he purchased the pistol with intent to commit suicide. If he

did not intend to commit suicide all of his contentions as to the purchase of the gun for that purpose and that he took it to the Elliott home for that purpose are of no value, and it must follow that when he went to the Elliott house the second time armed with a revolver he went there for some purpose other than suicide. The only other purpose for which he could have taken the revolver would be to use it if occasion required. When all of the evidence is considered in the light of the law applicable thereto it shows beyond a reasonable doubt that he was guilty of an assault with intent to kill and murder, and the jury was justified in so finding.

Defendant insists that in his opening statement the State's attorney erroneously stated that for the purpose of showing the motive of defendant the jury should know all of the details concerning the relations between him and Mrs. Wagner which prompted the writing of the letter; that on the trial the State's attorney erroneously called Mrs. Wagner as a witness and attempted to prove these details, and that on cross-examination of the defendant he asked him as to the details and called his attention to certain of these details contained in the statement of defendant made at the hospital immediately after the shooting. The court excluded all of this evidence, but defendant insists that it was error for the State's attorney to even mention these matters before the jury. The presence of a motive which would lead the accused to commit the act charged is important in the consideration of the question as to whether he committed the offense, and it is always proper for the People to prove motive where it can be done by competent evidence. (*People* v. *Zammuto,* 280 Ill. 225.) Guilt cannot be shown by evidence that the defendant has committed other offenses, but when relevant evidence is offered it is admissible notwithstanding it may disclose another indictable offense. (*People* v. *Watkins,* 309 Ill. 318; *People* v. *Cione,* 293 id. 321.) In *People* v. *Fricker,* 320

Ill. 495, it was held that in a prosecution for murder, evidence of the defendant's illicit relations with the wife of the deceased was admissible to show a motive for the crime, and the fact that such evidence disclosed another indictable offense does not render it incompetent if it tends directly to show that the defendant was guilty of the crime charged. In *People* v. *Spaulding,* 309 Ill. 292, the same rule is announced, and many cases are cited in support thereof from this State and from other jurisdictions. To the same effect is *People* v. *Selknes,* 309 Ill. 115. The meaning of this letter is not clear. It is apparent from the language used that there were certain matters between defendant and Mrs. Wagner which caused the writing of the letter. If these other matters indicated a motive for the shooting they were proper. The trial court evidently was of the opinion that evidence of this kind was not admissible under any circumstances. The nature of this evidence does not appear in the record, but if it tended to show motive, malice or intent it should have been heard by the court in the absence of the jury and its competency determined by the court so it could be reviewed by this court. The attempt of the State's attorney to introduce evidence which he thought was competent, and some of which was competent, was not error.

Defendant insists that the State's attorney not only improperly cross-examined defendant on the written statement made by him to the State's attorney at the hospital immediately after the shooting, but that after such cross-examination the written statement was not introduced in evidence. The statement is not in the record and we do not know its contents. The State's attorney had a right to cross-examine defendant on his testimony given on the trial and to call his attention to any statement made by him at the hospital contained in his written statement, (*People* v. *Okopske,* 321 Ill. 32; *People* v. *Kircher,* 309 id. 500,) but under the ruling of the court the entire statement was

not admissible and the State's attorney properly refused to offer it.

Defendant objected to various remarks made by the State's attorney in his opening statement and in his opening and closing arguments. The record does not contain all of the opening statement or all of the arguments—it only contains certain extracts therefrom. None of the argument for defendant is in the record. To many remarks to which objections are made by defendant in his brief no objection was made. In several instances an objection was made to some specific remark, and defendant in his argument includes other statements previously made to which no objection was interposed. A defendant cannot sit by and hear arguments made against him without objection and then assign such arguments as error in a reviewing court. If he wants the argument considered upon review he must object and secure a ruling from the trial court. We will only consider the statements and arguments to which specific objections were made.

In his opening statement the State's attorney, in referring to the statement of the defendant as to the purpose for which he went to the Elliott house, said: "That is what he was down there for with a revolver concealed in his pocket; not down there in any rage; not down there for any other purpose than by hook or by crook, at the expense of whatever human lives it might be necessary to take, to get that damaging piece of evidence against him. He tried it like Judas Iscariot. He did it with a smile. He had visited Mrs. Elliott at 4:00 o'clock—" With reference to the attempted suicide of defendant the State's attorney said: "If he intended to take himself out of this realm at that time because of what he had done this is his own judgment, and a more powerful judgment than you gentlemen are prepared to pass upon." He further said: "It is proper, I think, for me to say that if under the law you feel this was a serious attempt at suicide, under the

law of this State in cases of that kind you have a right to consider that as a consciousness of guilt and in the nature of a confession. It is not to be looked at under the law as a pitiful act—" Objections were made to each of these three separate remarks on the ground that they were argumentative. The objection was sustained to the first two and overruled as to the last one. Each remark may have been somewhat argumentative but it did not constitute reversible error. The State's attorney started to read the letter and an objection was sustained to it. He then stated its contents without objection, and concluded with the statement that "he says he is only human and asked to be forgiven, and if he has her forgiveness all will be well." Objection was made to any quotation from the letter, and the objection was overruled. The letter was later admitted in evidence. The jury knew its entire contents and defendant could not have been injured by the statements made. The State's attorney then said: "I think as a part of the motive you should know all the details concerning this affair between the minister and Mrs. Wagner." An objection was made, and the State's attorney said: "I think I have a right to state our side of the case. I don't know that it is incompetent. It is proof that will bear on the question of the motive and it will show his reason for going down there with a loaded gun for the purpose of getting it." The court refused at that time to pass upon the admissibility of the evidence but confined the opening statement to facts clearly admissible. No statement was made by the State's attorney as to what the relations were between defendant and Mrs. Wagner and it was not error for him to state what he thought he had a right to prove. The State's attorney later said: "As the trial proceeds we will particularly prove to you gentlemen the relationship between Mrs. Wagner and the defendant as throwing some light upon the whole transaction. If the court rules that the evidence is admissible it will be a collateral matter in one sense of

the word, but we feel that you should know what was in the heart of the defendant by reason of things that occurred which might throw some light upon this act. Malice aforethought, which you gentlemen of common sense well know, exists when a fellow pulls a dangerous weapon without provocation and shoots, there is malice aforethought." An objection was sustained to this last remark. The defendant has no ground for complaint. After reading the statute with reference to provocation the State's attorney said: "I know that they are going to try to make you think that this fellow was hurt. He was egged on, and there was some mental dust in his mind. That is not the provocation spoken of in the statute." To this statement an objection was sustained. These are all of the objections made to the opening statement and defendant was not injured in any way by any of the rulings.

In his opening argument the State's attorney, after referring to the number of witnesses who had been called to prove the general reputation of defendant, said: "Their testimony amounted to nothing. Every man until he commits his first crime bears a good reputation. I undertake that Jesse James, before he drew his first gun, was favorably spoken of among his friends and neighbors." An objection was sustained to this last remark. It is claimed that the State's attorney compared the defendant to Jesse James, but this contention is not sustained by the remark made. Referring to certain statements defendant is alleged to have made with reference to getting the letter, the State's attorney said: "These fellows that are talking about doing things never do them. He wants to get your sympathy—wants to get you to feel—wants you to get a sympathetic feeling for his act and let you bear the brunt of his crime. He made his bed; let him lie in it. There is not any reason why you gentlemen should bear the criticism and scorn of this crime by letting him go." Objection to this remark was overruled. There was no error in the

ruling. The State's attorney said: "This man, when he is standing still, on the first two .shots he fires strikes an old man a few inches below the heart and strikes with the second shot a defenseless woman." The clothes worn by Elliott indicating the place where the bullet struck Elliott were displayed before the jury. Objection to this display was made and overruled. The clothes were properly in evidence and the State's attorney had a right to display them before the jury. There was no error in this ruling. The State's attorney said: "He got his man first. He was after the second one on the—" The objection to this remark was properly overruled. The State's attorney commented on the testimony of Elliott with reference to defendant's statement that he wished he could see Mrs. Wagner and Mrs. Elliott together and remarked that that statement was significant, and said: "God save these three persons against whom this defendant had malice and wrath and against whom—" There was evidence sufficient to justify the remark, and the objection was properly overruled. The State's attorney said: "He not only hit them but hit them right in the neighborhood of the heart. You take this case right home to yourselves. Suppose something of this kind should happen to you in your own home. Look at it in another light if you have got any sympathy." An objection was sustained to this remark. It was also stated: "These persons have to suffer for the acts of this man and he is undertaking to pass it off upon someone else. He came into this court room and with a lack of manhood sets his wife in the prisoner's box." An objection to this remark was sustained. He further said: "She is not on trial, and that is set up to afford sympathy, and you ought not to permit that to influence you." An objection was overruled to this last remark, and properly so.

In his closing argument the State's attorney, in commenting on his inability to get in evidence the written statement made by defendant at the hospital on the night of

the shooting, said: "I was barred thereby from presenting to you gentlemen as to that particular statement which this defendant said he signed on each and every page of it—front to back—and as I told you before, I was in a position with my hands tied behind me." An objection was made to this statement and the court sustained the objection. He further said: "The fact is, I was precluded in this statement from getting it before the jury because certain parts of the statement were eliminated." An objection was sustained to this statement. The statement is borne out by the record. The objection was improperly sustained. After appealing to the jury to decide the case upon the law and the evidence he said: "He has tried to put it over on you and he thinks you are good Samaritans." Objection was sustained to this remark. He also said: "He wanted to get that letter. Is there any robber in the case? Look at the defendant." An objection was sustained to this statement. This was legitimate argument and the objection should not have been sustained. Most of the objections made by defendant were sustained. Some of them were sustained improperly.

It is insisted by the People that some of the argument on behalf of the People was based upon statements made by defendant in his opening statement and in his argument to the jury. There is nothing to show what was said in the opening statement and argument of counsel for defendant. It is difficult to determine from isolated sentences culled from an argument whether statements were or were not proper or whether they were in response to arguments made by opposite counsel. We are satisfied that this record does not show such overstepping of the bounds of legitimate argument based upon the record as would require a reversal of the judgment.

On behalf of defendant forty-eight instructions were submitted to the court, thirty of which were given, and a like number were given on behalf of the People. In his

brief and argument defendant has assigned error on almost every instruction given on behalf of the People and upon many instructions refused on behalf of defendant. The arguments on these instructions cover forty-five pages of the brief and argument. It is impossible within the reasonable limits of an opinion to consider each of them in detail. We have examined each of the instructions given on behalf of the People and each of the instructions refused on behalf of defendant. It is apparent that the jury was fully and completely instructed as to the law applicable to the facts in the case. The record on both sides is burdened with repetition of propositions of law which should have been covered by fewer instructions, but the judgment should not be reversed for errors in instructions.

The judgment is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*