THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, v. GARVIN G. MADDEN, DEFENDANT AND APPELLANT.

No. 9426.
Submitted November 5, 1954. Decided November 22, 1954.
276 Pac. (2d) 974.

Mr. John D. Gillan, Havre, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mrs. Vera Jean Heckathorn, Asst. Atty. Gen., Mr. Edward J. Ober, Jr., County Atty., Havre, for respondent.

Mr. Gillan and Mrs. Heckathorn argued orally.

MR. CHIEF JUSTICE ADAIR:

The defendant was convicted of assault in the first degree and appeals from the judgment of conviction and an order denying him a new trial.

The information charges: "That on or about the 21st day of February A. D., 1953 * * * defendant, Garvin G. Madden, at the County of Hill, in the State of Montana, with force and arms, did then and there, knowingly, willfully, unlawfully and feloniously and wrongfully and with the intent to kill Alice Madden, a human being, assault said Alice Madden with a deadly weapon, to-wit: a loaded firearm, contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the State of Montana."

In his single specification of error the defendant claims that it was error for the trial court to overrule defendant's motion for a new trial. He urges that the jury failed to consider evidence which he asserts reasonably, and as a matter of law, raised a reasonable doubt as to defendant's intent to kill.

*Sufficiency of the Evidence.* The testimony introduced by the state is to the following effect.

At the time charged in the information the defendant and the complaining witness, Alice Madden, were husband and wife.

In the latter part of January 1953 the couple, becoming estranged, ceased to live together and defendant moved out of the wife's home located at No. 1539 Fifth Street in Havre, Montana.

On Friday, February 20, 1953, the defendant purchased from a hardware store in Havre a new High Standard "Sport King" .22 caliber automatic pistol having Serial No. 338707, together with a used leather holster.

Thereafter, at about 9 o'clock on the evening of that day the defendant entered the Palace tavern in Havre at which time his shirt was unbuttoned and open revealing a leather strap beneath, worn across defendant's chest by means whereof defendant was carrying his recently purchased pistol and holster.

The state's witness Archie Maze testified that he was the bartender on duty at the Palace tavern on such evening; that at such time he noticed that defendant was drinking and that he was carrying what the witness thought was a gun; that the witness talked with defendant and asked the latter if he would leave the gun with the witness; that defendant complied with the bartender's

request and left with him the High Standard .22 caliber pistol together with the leather holster and a light colored leather strap.

The witness Maze further testified that at about 9 o'clock in the morning of the following day, being Saturday, February 21, 1953, the defendant returned to the Palace tavern for his pistol, holster and strap stating that he was going to take them home and put them away whereupon the witness delivered the pistol, holster and strap to the defendant who he said then appeared to be sober and entirely normal.

At about 10 o'clock on such Saturday morning, February 21, 1953, the defendant, appearing at his wife's home at No. 1539 Fifth Street in Havre, was admitted to the kitchen where he talked with the wife for a while.

She testified: "He had a strap across his shoulder and I asked him what it was and he told me he had been sick and the doctor had taped him up. * * * He asked me to take him back, and I said, 'No.' There was no happiness there on either side. * * * After I asked him to have coffee, he asked me if he could use the bathroom."

When defendant emerged from the bathroom he was holding his newly acquired automatic pistol in his right hand. The wife testified: "Well, *he was holding this gun* on his side with his jacket partly shielding it, *and he said, 'This is it.'* " She testified that defendant then asked her to go into another room with him; that she told him she wasn't going; that thereupon the defendant, using his left hand, seized her right arm, and, *with the pistol still held in his right hand and pointed at her,* started pulling her toward the living room.

The wife testified "we slowly struggled towards the north wall and we got there and there was no place else he could go to pull me. There was a rocking chair stitting there *and he put the gun to his side,* and we were very close together. *I had hold of the gun, and he was trying to do something with it.* I didn't know what. *I heard a click* * * * and after the clicking, *he started forcing the gun towards my body and I couldn't hold it.*"

The wife testified that at this time *defendant turned the pistol toward her body.* She made answer as follows:

"Q. He turned it [the pistol] towards your body? A. Yes.

"Q. And the gun fired? A. Yes.

"Q. Were you frightened? A. Very much so."

The bullet struck the wife in the leg breaking the bone thereof and necessitating resort to surgery as well as the placing and keeping of the leg in a plaster cast for months.

As to what happened when the bullet struck her the wife testified: "I fell and as I fell part of the gun came with me. I picked up part of the gun and threw it under the china closet. He leaned over me and reached under the china closet, and he was trying to get the piece that I had thrown under there. * * * I asked him for a cigarette and he didn't answer. I asked him for a anacin and he didn't answer. I asked him to pick me up and put me on the bed and *he told me I could lie there and plead, that he wasn't through with me yet. He was trying to put the gun back together.* He was on his knees—beating it against the floor. At first it was the barrel, and then he reversed it and used the other end against the floor, After the gun wouldn't go together, the shells were removed and they rolled out on the living room floor. *I made an attempt to crawl to the phone, and he told me to lay where I was at or I would get some more* * * * He seen somebody walk by the west window—an object or a shadow. He took and walked out of the living room and took the gun with him, and he went out there and locked the door."

She further testified that *defendant had the gun in his hand at the time he left the living room;* that she heard him lock the door by which he had entered her home; that then the police and the doctor arrived; that at the command of Chief of Police Mooney the defendant unlocked the door and admitted the officers to the house; that thereupon *defendant told the officers that if they stepped into the hall he would kill them.*

On her direct examination the complaining witness was interrogated and made answer as follows:

"Q. Do you recall any of the circumstances, or conversations,

when the police arrived? A. Mr. Mooney, the Chief of Police, asked him [defendant] to unlock the door after he had tried it.

"Q. Did you hear that? A. Yes, I did.

"Q. And was Mr. Mooney admitted to the house? A. He asked Mr. Madden to unlock the door. They had been acquainted for many years, and he didn't want any more trouble.

"Q. Do you know—did Mr. Mooney come into the house? A. Mr. Madden unlocked the door and let him in.

"Q. Then what happened? A. *He told them if they stepped into the hall he would kill them.*

"Q. By 'he' do you mean Mr. Madden? A. *Mr. Madden told the law and the doctor that.*

"Q. Now, where were you at that time? A. I was still in the living room.

"Q. Did you ever get into the kitchen or near the kitchen while Mr. Mooney was there? A. Yes, sir.

"Q. Would you tell us about that? A. *When he threatened to kill Mr. Mooney, I drug myself to the kitchen and told Mr. Mooney not to take any chances—he had a gun, and that he had already shot—used it on me.*

"Q. Do you know whether or not, can you state now, did you see whether Mr. Madden had a gun in his hand at that time? A. *When I was speaking, the gun was behind his back.*

"Q. Was he disarmed? A. Yes. The law disarmed him.

"Q. And were you taken to the hospital? A. Yes.

"Q. I believe you stated you were shot in the leg? A. Yes.

"Q. Did you undergo surgery? A. Yes."

Arthur J. Een, deputy sheriff of Hill County and a witness for the state, testified that on Saturday morning, February 21, 1953, he accompanied Chief of Police Mooney to Alice Madden's home in Havre in response to a report concerning a shooting which had there occurred. He further testified:

"Well, we got out of the car * * * Mr. Madden was standing on the porch, and when we got out of the car, he went back in the house. We went over to the house and at that time the door was locked. * * * Well, then, Andy Wilson, one of the policemen who

was off duty at the time—he lives several houses away—he came came over, and Mr. Mooney told him to go around to the back door. Well, Mr. Mooney rapped on the door and told him to open up—'This is the police' and after everything was quiet for a little while there, then shortly the key turned in the lock and the door opened and *Mr. Madden stood there with the gun in his hand. He told us if we came any further he would shoot us,* and we walked nearer the door, and as we walked forward he backed up. Then I seen Mrs. Madden lying on the floor, and she had reached out and grabbed hold of the door casing and had pulled herself forward. I could see that her leg was badly broken. She was just dragging her leg more or less, and she said, *'He will shoot you two—he has already shot me.'* Mr. Mooney talked to Mr. Madden, and he apparently had known him for a number of years. As Mr. Mooney kept talking to him, we kept walking forward and Mr. Madden he kept backing up, and finally Mooney grabbed him and then I grabbed the gun away from him, and then I gave the gun to Virgil and took Mr. Madden outside.

"Q. Did you take him to the police station? A. Then Andy Wilson and I put him in my car, and we took him to the station and put him in the cell in the city jail.

"Q. Did he appear to be intoxicated or sober? A. *No, he wasn't intoxicated.* Mr. Mooney, after he took him to the car, *Mr. Mooney asked him if he was drunk, and he said that he hadn't had anything to drink. He didn't appear to be drunk to me at all.*

"Q. Could he speak—did he have a slur in his words or anything? A. No.

"Q. Did he appear to be alert? A. Oh, yes."

Again:

"Q. Mr. Een, you stated *that the block was gone from this gun when you took it from the defendant? A. Yes.*

"Q. Do you know where the block was? A. At the time I didn't know the block was gone until I took it away from him.

"Q. Can you describe to the jury how he was holding that gun? A. As I remember, it was about like this (indicating).

"Q. Do you recall if at any time he had it like this? A. Well,

I don't remember the exact position. However his hand did cover the top there.

"Q. Covered this space here where the block would fit? A. Yes.

"Q. *Was he pointing the gun at you and Mr. Mooney? A. Yes, he was.*

"Q. *You could look down the barrel of it? A. Pretty well.*

"Q. Were you at all afraid? A. Well, I get a little afraid when I am on that end of them, yes.

"Q. In your opinion, *when you took Mr. Madden down to the station and booked him, he was normal*—like a normal person? A. *Yes, he was, in my opinion.*"

Virgil Mooney, the chief of police testified: "We got out of the car and we started walking towards the door, that faces the south, and Mr. Madden was standing just outside the door on the porch looking west, and at approximately one-third of the way down he turned and saw me walking towards the house and he turned and went back in the house, and when I got to the door the door was locked. * * * I told Mr. Wilson to go around to the other door, and then I knocked on the door, and *I told him to open the door. I told him approximately three times.* The last time I told him, 'Stub, you will have to open this door or we will break it down.' He came and opened the door then. * * I stepped inside the door and about that time his wife, Mrs. Anderson [Mrs. Madden] spoke to me and she said *'Mooney look out, he has got a gun and he'll get you. He has already shot me.'* At that time I looked over towards the door, and I could see her lying on the floor. I looked back at Stub, and *he had the gun along his side and it was pointing right at me.* I asked him what all the trouble was and he said nothing. So I stepped towards him and he stepped back. So I kept walking towards him and he kept stepping back. There was a hallway approximately eight feet from the back door, and as I stepped forward he kept stepping back until we got to the kitchen. Then I moved to his left and Art Een, the deputy sheriff, was walking behind me, and as I moved

to the left I grabbed him and then Deputy Een grabbed the gun. * * *"

Again:

"Q. Now while you were in the house was Mrs. Anderson removed in an ambulance? A. She was.

"Q. Did you make any search of the house? A. I did.

"Q. *Did you find any portion of a gun?* A. I did.

"Q. And will you tell the Court and jury what you found and where you found it? A. *I found three loaded shells and one empty about in the middle of the floor in the front room, and the block part of this gun under a china closet* at the north wall in the front room. * * *

"Q. Did you go down to the police station later on and see Mr. Madden? A. I did.

"Q. And at that time did you remove a holster from his body? A. I did.

"Q. Could you describe to the jury how he was wearing it? A. He was wearing it over his undershirt and under his main shirt. The shirt was open and you could see the strap. He was wearing it as a shoulder strap. * * *

"Q. About what time was it that you removed this holster and strap from the defendant, do you recall now? A. *About eleven A. M.*

"Q. *At that time, did he appear to be intoxicated? A. He did not.*

"Q. Did he appear glassy eyed? A. I would say not.

"Q. Did you have a conversation with him? A. I did."

The mere statement of the facts of this case as above testified to by the state's witnesses is a complete answer to the contention that the verdict is not supported by the evidence. People v. McGee, 14 Cal. App. 99, 111 Pac. 264.

R. C. M. 1947, sec. 94-601, defining assault in the first degree and prescribing the penalty therefor reads: "Every person who, with intent to kill a human being, or to commit a felony upon the person or property of the one assaulted or of another:

"1. Assaults another with a loaded firearm, or any other dead-

ly weapon, or by any other means or force likely to produce death; or,

"2. Administers or causes to be administered to, or taken by another, poison, or any other destructive or noxious thing, so as to endanger the life of such other, is guilty of assault in the first degree, and is punishable by imprisonment in the state prison not less than five nor more than twenty years."

*Criminal Intent.* The element of felonious intent in every contested criminal case must necessarily be determined from the facts and circumstances of the particular case,—this for the reason that criminal intent, being a state of mind, is rarely susceptible of direct or positive proof and therefore must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.

In State v. Kneedy, 232 Iowa 21, 3 N. W. (2d) 611, 615, the court said: "We have repeatedly held that knowledge or intent is seldom capable of direct proof. It is usually inferred from the proven surrounding circumstances."

In Murphy v. State, 79 Okl. Cr. 31, 151 Pac. (2d) 69, 71, it is said: "Where intent is necessary in the commission of a crime, it has been held that it may be proven by circumstances and by the action of the party at the time. The question of intent is a question for the jury. It may be inferred by them from what accused does and says and from all the facts and circumstances involved in the transaction. (Citing authorities.) One will be held accountable for the logical and ordinary consequences resulting from his acts."

In People v. O'Grady, 339 Ill. 263, 171 N. E. 143, 144, it is said: "It is next contended that there was no evidence to show any intent to kill, and that the verdict of the jury finding the plaintiff in error guilty of assault with intent to kill was the result of passion and prejudice. While it is true the plaintiff in error testified that he did not intend to kill Oakley and that he shot at his legs, we cannot say there was not sufficient evidence to sustain the verdict. It is apparent from the testimony of the physician who attended Oakley that one of the bullets struck in

the upper part of the thigh and another in the hip. Either of these bullets might have caused death had they struck in a slightly different place. Criminal intent may be manifested by the circumstances connected with the perpetration of the offense without any positive testimony as to such intent. People v. Yuskauskas, 268 Ill. 328, 109 N. E. 319; Crosby v. People, 137 Ill. 325, 27 N. E. 49. In the latter case we said: 'It is not necessary to a conviction, however, that an express intention need be proved. Every sane man is presumed to intend the natural and probable consequences of his act, and it has been uniformly held, therefore, that the intent may be inferred from the acts of the person charged with crime as well as by words or declarations.' "

In People v. Wilson, 342 Ill. 358, 174 N. E. 398, 401, it is said: "It is not necessary that the party charged may have brooded over the intent or entertained it for any considerable time. It is sufficient if at the instant of the assault he intended to kill the party asaulted. It is sufficient if he is actuated in making the assault by that wanton and reckless disregard of human life that denotes malice and the assault is made under such circumstances that if death had ensued the killing would have been murder. (Citing cases.) Every sane man is presumed to intend all of the natural and probable consequences flowing from his own deliberate act, therefore if one voluntarily and willfully does an act the direct and natural tendency of which is to destroy another life, the natural and irresistible conclusion, in the absence of qualifying facts, is that the destruction of such person's life was intended. (Citing cases.) If a sane person deliberately assaults another with a dangerous weapon likely to produce death and the assault be such that if death resulted the crime would be murder, the express proof of the intent to murder is not required. (Citing cases.) If a sane person fires a revolver at or towards another, either with malice aforethought or with a total disregard of human life, he may be convicted of an assault with intent to kill and murder the person so attacked. (Citing case.) Criminal intent may be mainfested by circumstances connected

418

with the perpetration of the offense without any positive testimony as to such intent. (Citing cases.)''

The question of defendant's guilt or innocence was for the jury ██ and, the verdict being sustained by substantial evidence, cannot be disturbed by this court under the facts and circumstances shown by the record herein. Compare State v. Curtiss, 114 Mont. 232, 240, 135 Pac. (2d) 361; State v. Robinson, 109 Mont. 322, 329, 96 Pac. (2d) 265; State v. De Haan, 88 Mont. 407, 408, 292 Pac. 1109; State v. Popa, 56 Mont. 587, 589, 185 Pac. 1114; State. v. Byrd, 41 Mont. 585, 605, 111 Pac. 407; State v. Hilbish, 126 Kan. 282, 267 Pac. 1109; 53 Am. Jur., Trial, sec. 290, page 244, 4 Am. Jur., Assault & Battery, sec. 178, page 211; 3 Am. Jur., Appeal & Error, sec. 887, pages 441, 449.

The judgment and order appealed from are affirmed.

MR. JUSTICES BOTTOMLY, ANGSTMAN, FREEBOURN and ANDERSON concur.