SAMUEL B. MILLER v. CEDAR RAPIDS SASH & DOOR COM-
PANY, Appellants.

**Master and servant:** MACHINERY GUARDS: SUFFICIENCY: STATUTE. The purpose of the statute requiring machinery to be guarded so as to protect the operators or those coming in contact therewith contemplates such means of protection as will reasonably accomplish the purpose, without unreasonably interfering with the efficiency of the machine. In this case it is held that the guard placed over a belt operating the machine and set in cleats in the floor, which could be easily toppled over from the side nearest the machine was not improper, unless from the customary use of the machine it was likely to be toppled over.

**Same:** UNGUARDED MACHINERY: NEGLIGENCE: EVIDENCE. In this action the questions of whether the plaintiff operated the machine in the usual and customary manner, or in a way the master should have anticipated when guarding the same; and whether the guard might have been constructed so that it would not have toppled over when the machine was operated as the plaintiff did operate it, without unreasonably interfering with its usefulness, were for the jury; and the evidence is held to support a finding that the guard was improper.

**Same:** CONTRIBUTORY NEGLIGENCE: PROXIMATE CAUSE. Even though plaintiff's negligence in operating the machine may have been the proximate cause of his injury, yet as it was concurrent with that of defendant in failing to properly guard the machine, that fact would not relieve defendant from liability for the injury.

**Same:** CONTRIBUTORY NEGLIGENCE: EVIDENCE. In this action there was evidence that plaintiff did not know that the belt guard of the machine with which he was at work would turn and allow his foot, with which he operated the power lever, to slip into the belt, and he was not therefore negligent as a matter of law in thus operating the machine.

**Same:** NEGLIGENCE: INSTRUCTIONS. Although the court told the jury generally in one instruction that for plaintiff to recover he must establish by the greater weight of the evidence that defendant was guilty of negligence which caused his injury, failure of the court in that paragraph to limit the negli-

gence to the grounds specified in the petition was not erroneous, where the same were clearly stated in defining the issues, thereafter separately and specifically submitted, and there was no evidence of negligence except as charged.

**Same.** An instruction that if the machine guard was of such character that defendant would not be negligent in providing the same, when in the exercise of reasonable care for the safety of his employees, he would not be liable for plaintiff's injury thereby, being of a negative character, was not prejudicial even if imposing on defendant too high a degree of care.

**Same: ASSUMPTION OF RISK: INSTRUCTIONS.** Failure of the court in its instructions on assumption of risk to refer to such risks as are incident to the employment was not erroneous, where the only risks alluded to in the evidence were those charged in the petition and shown to have been known to the defendant but not to the plaintiff.

*Appeal from Cedar Rapids Superior Court.*—Hon. C. B. Robbins, Judge.

WEDNESDAY, JANUARY 17, 1912.

ACTION for damages resulted in judgment against defendant, from which it appeals.—*Affirmed.*

*Dawley & Wheeler,* for appellant.

*Barnes & Chamberlain,* for appellee.

LADD, J.—The plaintiff was engaged in operating one of defendant's machines, known as a "sander," when, as is alleged, his right foot was caught in a belt, drawn through an opening in the floor, and both bones fractured below the knee. The two grounds of negligence alleged are: (1) In failing to properly guard the rapidly running belt, so that plaintiff's foot could not come in contact therewith while he was engaged in operating the machine; and (2) in negligently and carelessly using and permitting to be used a belt upon the said machine with a hole in it.

Several errors are assigned, to intelligently understand which references must be made to the facts. The sander is somewhat difficult to describe. It was about four feet high, when the pressure top was down, and something like five feet wide. The pressure top could be raised about twelve or fourteen inches, and will take in forty-two inches of lumber in width, which was fed by the operator between the pressure top and the bed. This top was heavy, weighing about one thousand pounds, and could not be raised by hand. It was raised by power, which was applied by means of a small lever at the left end of the machine; the operator facing it. This lever worked sidewise and over a space of about two or two and one-half inches, and was about two feet from the floor. The power to run the sander came from the main shaft, and thence to the sander by means of belt connections over pulleys at the right end of the machine. It was used to smooth lumber by sandpapering it, pressing lumber against three revolving rollers; the first being covered with coarse, the second with medium, and the third with fine sandpaper. To raise the pressure top, the operator, facing the machine, pushed the pressure lever to his left, away from the machine, and to lower it he pulled this lever toward him a distance of about an inch and a half. The power lever was at the operator's right, and at the right end of the machine. Its lower end was fastened beneath the floor, and it passed through a slot in the floor and stood above it four and one-half or five feet. This lever is a strip of hard pine, one and one-eighth inches in thickness, and varying in width from four inches at the floor to two inches at its top, and its purpose was to put on or throw off the power from the sander; the power being applied by pushing the lever to the right, or from the machine, and throwing it off by pulling it toward the machine. The rollers referred to are connected with three different pulleys at the right end of the machine, and these are turned by belts, which pass from the pulleys through

the floor to the shafting. These pulleys, belts, and the holes in the floor through which they run are covered by a guard, which is "made from an eight or ten inch board that comes from the floor on a slant to above the pulley, then ranging back over another pulley, and then down to the floor." Boards were nailed on the outside from the machine, leaving spaces four or six inches wide, with nothing on the inside, toward the machine. Slats three-fourths or seven-eighths of an inch thick were nailed to the floor all around the hood or guard, so that it set in a pocket or groove, the depth of the slat. It was fastened in no other way. This description will be better understood by reference to the attached photograph, which shows the guard set out from the machine.

The plaintiff testified that the first belt conveying power was directly in front of the power lever, about two and one-half inches from it, and that the front board of the hood stood between these, and about an inch from the belt;

and, further, that: "On the afternoon of the 24th day of December, 1909, just before I was injured, I was putting a door through the machine, and the paper tore. When the paper tears, it gives an unusual noise—clip, clip, clip —very fast, and it is then customary to stop the machine as quickly as possible, because if the paper should tear and get fast under the drum it is liable to tear the felt or wires in the drum, and so cause a delay of five or six hours to fix it. On this occasion, I found the paper torn on the front drum. I threw the power off, and discovered that the paper on the front drum was torn. I released the pressure enough to take the door out. When I had the door out, I found that the paper wouldn't tear, and, in order to re-lease the paper, I took hold of the pressure lever, and found that the power was out. The motion stopped, and I reached over with my foot to the power lever." After saying that, to "raise the drum and get the paper off, it will be necessary to put the machine in motion again," he proceeded: "I took my foot, with my hand on the pres-sure lever and my foot against the power lever, to raise the bed. Q. What occurred then? A. My foot slipped off the power lever against the hood, and threw the hood off, and my foot went in between them. Q. Was your foot caught in the belt, or not? A. The belt caught my foot and drew it onto the floor. My foot was in the slot in the floor, when I raised myself up by taking hold of the power lever and pulling myself up. Q. Where was the guard? A. The guard was right on its side. Q. Were you able to get up yourself? A. Yes, sir; I did. Q. How did you raise yourself? A. By taking hold of the power lever. Q. What did you discover when you pulled your-self up—did you raise the guard from the floor? A. Yes, sir. . . . The belt was at high velocity when my foot got tangled with the belt, which came off. I had to pull the belt out to get my foot out, and I found, after I pulled

the belt up, there was a hole in it. . . . Q. Was your foot in the neighborhood of the hole? A. Yes, sir."

The witness testified further that he had been directed by the superintendent to work rapidly, as they wished to get the work then on hand done that evening, as the shop would be closed for a week, though the superintendent denied having told him to hurry, but explained that he did say that the work should be done that evening, even if it were found necessary to work overtime. Plaintiff testified that his foot was on the lever, about eighteen inches from the floor, when it slipped, and that at that time his left hand was on the pressure lever, and his right hand on the table; that he might have stepped over and pushed the lever by hand, but that he had frequently done so with his foot prior to that time; that if the guard not not fallen, his foot would not have gotten into the belt; that his face was toward the power lever when his foot slipped, and instantly, upon striking the edge of the guard, it was caught by the belt; that the hole in the belt was about two and a half inches one way by one-half inch the other. "Q. You do not know whether your foot got caught in that hole, or not? A. Certainly, I do. Q. Do you mean that your foot got caught in a hole about two and one-half inches long and a half-inch wide? A. Yes, sir. Q. How do you know that your foot got caught in the hole? A. Because it was there, and the belt had the edge of my sole in the edge of the hole."

Whether it would have been practicable, without interfering with the operation and efficiency of the machine, to have attached the guard with a small latch to the floor, or by bracing it to the cupboard in the rear, or by drilling a small hole into the casting forming the side of the sander, and inserting the screw eye therein, and connecting the hook to the top of the guard, was in dispute, as was also the distance from the pressure lever to the power lever,

plaintiff estimating this at sixty-six inches and defendant's witnesses testified it was seventy-eight inches.

There was also a conflict in the evidence as to whether employees, in operating the sander, frequently, when lifting the pressure top with the left hand applied to the small lever, turned on the power by pressing the foot against the power lever, the plaintiff saying that this was done nearly every day, and had been done by him in the presence of a superintendent not then in the factory, and he was somewhat corroborated by another, who had operated the machine; while the testimony of the superintendent was to the effect that this was improper and dangerous practice; that it had never been observed by him; and that it was impossible for a person of plaintiff's height, because of the distance between the two levers, to perform the work in this way, and this testimony was somewhat corroborated by other witnesses. The sandpaper on the drums ordinarily lasted about nine hours, and in changing this it seems to have been necessary, not only to stop the machine, but to remove the guard. So that the guard was removed nearly every day, and sometimes several times the same day.

I.    The defendant's first contention is that the evidence was not sufficient to sustain a finding that the belt was not properly guarded. It was guarded, so that the inquiry was necessarily limited to ascertaining whether this was properly done. The design of the statute is that something shall be placed near to or over the machine or parts thereof specified in such a manner, and of such material, as to protect employees coming in proximity with or using it from being injured by coming in contact therewith. As said in *Kirchoff v. Creamery Supply Co.,* 148 Iowa, 508: "What such guard shall be is not specified, save in exacting that it shall be proper. According to the lexicographers, 'proper' means 'fit, suitable, appropriate;' and to be guarded 'properly' is to be so covered as to reasonably accomplish

1. MASTER AND SERVANT: machinery guards: sufficiency: statute.

the design of guarding. A planer or other instrumentality mentioned in the statute is properly guarded when the device attached is of material and construction, such as will shield those operating it, or moving near it, from contact therewith, when in motion, at least when practicable, without unreasonably interfering with the efficiency of the machine. If not reasonably suitable and calculated for this purpose, the cover is not proper, and the proprietor, in omitting to obey the mandate of the statute, is guilty of negligence." The guard, according to the evidence, was set inside of the cleats nailed to the floor. As to those approaching from the side opposite the machine, it probably was sufficient, but, not being otherwise fastened, it could be easily toppled over by pressure from toward the machine. In that direction it would seem that little protection was afforded by it. Was this required? Certainly not, in so far as this case is concerned, unless the plaintiff, in moving the power lever with his foot, operated it in the usual or customary way, or as the defendant might reasonably have anticipated its employees would operate it.

The plaintiff testified that this was the usual way, and that he had pushed the lever over with his foot nearly every day, and sometimes oftener, during the two months he had operated the machine, and once, at 2. SAME: un-guarded ma-chinery: neg-ligence: evi-dence. least, in the presence of a superintendent, and this was corroborated by another witness, who testified that he had done the same, especially when in a hurry. On the other hand, the practice was declared by the superintendent, who denied all knowledge of it, to be dangerous and improper, and there was evidence tending to show it to have been impossible for one of plaintiff's height. It is clear from this recital that the issue was for the jury, and that it might have found, either that moving the lever with the foot, in the contingency in which plaintiff acted when injured, was the

usual method, or such as defendant reasonably should have anticipated in guarding the machine.

If, then, the power lever might properly be moved with the foot, was it enough to set the guard over the belts and pulleys without fastening it, otherwise than by the cleats, in some way? The evidence in behalf of plaintiff indicated that the guard might have been held in place by a latch attached to the floor, or by a brace back of it, or by a hook attached to the frame of the sander, without interfering with the belting, or much inconveniencing the handling of the guard; while that on the part of defendant tended to show that these could not have been used, because of the location of the belts, or were impracticable, because of interfering with the use of the guard, which had to be removed several times a day—every time a sandpaper on a roll tore, or was worn out. Doubtless any of the fastenings, such as mentioned, would have interfered somewhat with the performance of the work, for the guard must be unfastened before being removed; but this was a circumstance to be taken into account in connection with the probable danger to the employee in operating the lever without having the guard fastened. If the situation was such that, notwithstanding its interference with the rapid removal of the guard, an ordinarily prudent person would have deemed the fastening essential to the protection of employees in the operation of the machine, then this was required to constitute a proper guard, and defendant was negligent in not providing such fastenings as would have held the guard in place. Of course, the converse follows, and the evidence was such as to carry this issue, also, to the jury.

We conclude, then, that there was sufficient evidence to sustain the finding that defendant was negligent, in that its belt on the sander was not "properly guarded."

II. It is said, however, that, even though defendant might have been negligent in not providing a proper guard,

neither this nor the hole in the belt was the proximate cause of the injury. Had the guard been fastened, the plaintiff's foot could not have reached the belt. Being unfastened, the guard fell over and let the foot in the belt, which injured it. The direct sequence of the defect in the guard was the injury to the foot by the belt. Of course, if the foot had not slipped, the guard would not have fallen off. Nor would this have happened, had plaintiff moved the lever by hand, instead of attempting to do so with his foot. The slipping of the foot, like the attempt to move the lever with it, however, was the bringing of that portion of the plaintiff's body within the danger zone of defendant's negligence, and could not have intervened between its continuing negligence in operating the belt without a proper guard and the plaintiff's hurt when brought in contact therewith. In other words, the slipping of the foot and consequent pushing of the guard, even though the proximate cause, did not intervene between the negligent operation of the belt and the injury, but, at most, was concurrent therewith, and this would not obviate defendant's liability. *Bales v. McConnell,* 27 Okl. 407, (112 Pac. 978); *Buehner v. Creamery Package Co.,* 124 Iowa, 445; *Walrod v. Webster Co.,* 110 Iowa, 349.

*3. SAME: contributory negligence: proximate cause.*

III. Nor can it be said that, in undertaking to move the lever with his foot, if this was not an improper manner of doing so, plaintiff was guilty of contributory negligence. Of course, he knew how the guard was constructed, and where the pulleys and belts at the right end of the machine were, but he had the right to assume that these were properly guarded, without making an investigation. He was asked if he knew that guard "could be pushed off altogether from your side? A. I know now. Q. You knew before your injury that if your foot should slip off that lever and hit the inside of the hood, or the edge of the hood, that you were

*4. SAME: contributory negligence: evidence.*

liable to push it off? A. No; I did not know that. I did not know that. Q. What was there to hold it on? A. There was nothing there. It proved to be nothing there. Q. You knew there was nothing there before you were hurt? A. I did; but I did not know it would go off. Q. You knew there was nothing to prevent its falling off? A. I never saw it go off before. It had never gone off before that I know of." The jury might have found that he was performing the work in the usual manner, and that he had been directed to hurry. In these circumstances, it ought not to be held, as a matter of law, in pushing the lever with his foot he was negligent. *Pierson v. Railway,* 127 Iowa, 13; *Buehner v. Creamery Package Co.,* 124 Iowa, 450.

IV. Several of the instructions are criticised. In the second, the jury was told generally that, in order to recover, plaintiff must prove, by the greater weight of evidence, that defendant was guilty of negligence which caused his injuries, and in the third such general finding is referred to, and it is argued that in each there was error in not limiting such negligence to the grounds specified in the petition. It is enough to say (1) that the grounds of negligence had been clearly stated in defining the issues, (2) were subsequently separately and specifically submitted in the fourth and fifth paragraphs of the charge, and (3) no evidence was adduced tending to prove any neglect, other than charged. Moreover, in the seventh paragraph, the jury was informed that the burden of proof was on plaintiff to establish the injury by negligence of defendant in the manner "claimed by him," thereby limiting the same to the grounds alleged. We think the reference to negligence sufficiently specific to avoid possibility of the jury going beyond the issues.

Exception is taken to that portion of the fourth instruction, directing the jurors, if they found that "the

5. SAME: negligence: instructions.

guard on the machine in question was such a guard as
would be deemed ample and sufficient, for
6. SAME.                protection of those engaged in operating said
machine, by a man in the exercise of ordinary care for the
safety and protection of his employees," the defendant was
not negligent. Even if this did indicate too high a degree
of care, though we think it did not, it, being negative,
could not have prejudiced defendant.

The sixth and seventh instructions are criticised, in
that, in submitting the issue as to assumption of risk,
"such risks as are incident to the employment" were not
alluded to. Had other risks than those of
7. SAME: assump-        the alleged defective guard and the hole in
tion of risk:
instructions.           the belt been touched in the evidence, this
criticism would have had merit. But the record was such
that none other could have been considered by the jury.
Though defendant's superintendent had known of the hole
in the belt several years, the testimony of plaintiff, that
he had not observed it prior to his injury, was uncontra-
dicted. He could not then have appreciated the danger,
and therefore could not have assumed the risk. The de-
fendant had constructed the guard, and, of course, was
aware of its condition, and under chapter 219 of the Acts
of the 33d General Assembly was not in a situation to set
up the defense that plaintiff had assumed the risk, either
as to it, or to the hole in the belt, unless it was his duty
to repair or remedy the defects alleged, and this issue was
submitted to the jury. The instructions, in view of there
being no evidence concerning risks incidental to the em-
ployment and not solely due to defendant's negligence, were
in accordance with the cited statute, which provides: "That
in all cases where the property, works, machinery, or ap-
pliances of an employer are defective or out of repair, and
where it is the duty of the employer from the character of
the place, work, machinery, or appliances to furnish rea-
sonably safe machinery, appliances or place to work, the

employee shall not be deemed to have assumed the risk, by continuing in the prosecution of the work, growing out of any defect as aforesaid, of which the employee may have had knowledge when the employer had knowledge of such defect, except when in the usual and ordinary course of his employment it is the duty of such employee to make the repairs, or remedy the defects. Nor shall the employee under such conditions be deemed to have waived the negligence, if any, unless the danger be imminent and to such extent that a reasonably prudent person would not have continued in the prosecution of the work; but this statute shall not be construed so as to include such risks as are incident to employment. And no contract which restricts liability hereunder shall be legal or binding."

We discover no error, and the judgment is *affirmed*.