STATE OF IOWA, Appellee, v. HERBERT KNEEDY, Appellant.

No. 45649.

May 12, 1942.

REHEARING DENIED SEPTEMBER 25, 1942.

White & Bruner, of Carroll, for appellant.

John M. Rankin, Attorney General, Jens Grothe, Assistant

Attorney General, and Lloyd Karr, County Attorney, of Webster City, for appellee.

GARFIELD, J.—Appellant, Herbert Kneedy, was indicted for assault with intent to murder one Cook. Upon the trial the court withdrew from the jury the crime charged in the indictment but submitted the included offenses of assault with intent to inflict great bodily injury and assault and battery. The jury found Kneedy guilty of assault with intent to inflict great bodily injury, on the theory that he aided and abetted Claude Van, who struck the blow. In a separate trial, Van was convicted of the same offense and his conviction has been upheld by us. State v. Van, 232 Iowa 34, 2 N. W. 2d 748.

At the close of the State's testimony, appellant moved for a directed verdict because of insufficient evidence. The motion was overruled and was not renewed, although appellant offered evidence in his behalf. Following the verdict, appellant moved for a new trial, challenging the sufficiency of the evidence to sustain the verdict. This motion was overruled and judgment entered on the verdict. The overruling of the motion to direct is not before us. That motion was waived because not renewed and the case is before us as if no such motion had been made. Appellant cannot be heard to say that there was no evidence to submit to the jury. State v. Asbury, 172 Iowa 606, 615, 616, 154 N. W. 915, Ann. Cas. 1918A, 856; State v. Bosworth, 170 Iowa 329, 331, 152 N. W. 581; Annotation 17 A. L. R. 910, 925, and citations. Nevertheless, the sufficiency of the evidence to support the verdict is properly reviewable because raised in the motion for new trial. State v. Tibbits, 207 Iowa 1033, 1035, 222 N. W. 423; State v. Dolson, 188 Iowa 629, 630, 176 N. W. 678; State v. Chambers, 179 Iowa 436, 440, 161 N. W. 470. This is the only question before us on this appeal. No other complaint is made.

On the afternoon and evening of January 4, 1941, Van and Kneedy were in Fitzgerald's pool hall and beer parlor in Webster City. Shortly before midnight, closing time, Van, Kneedy, and one Johnson, who was playing pool with Van, engaged in a heated argument in which loud talk and profanity

were used. The argument started when Johnson discovered that five pool balls with which he and Van had been playing were in Kneedy's pocket. Van had placed them there. Johnson accused Kneedy of assisting Van to cheat in the pool game, which Kneedy testified was played for money. Fitzgerald and his employee, Powell, asked Van and Kneedy more than once to leave. They both defiantly refused to go. Thereupon Fitzgerald took Kneedy by the collar and pushed him out the front door. Kneedy admitted as a witness that he resisted by pushing back. Powell, with some assistance from Cook, put Van out.

As Van was being put out, and when within 3 or 4 feet of Kneedy, he turned to Powell and Cook and threatened to get even with them. As soon as Van and Kneedy were outside, Fitzgerald held the door shut with his foot to prevent them from re-entering. There is evidence that Cook assisted in holding the door shut. It was a double door with large glass panels. Kneedy immediately began pushing the door open and succeeded in opening it a sufficient distance for Van to reach in and strike Cook, who fell to the floor unconscious. The blow was struck instantly as the door was opened. After Cook was struck, Fitzgerald and Powell went out the door. Both Van and Kneedy ''came at'' Fitzgerald with their fists doubled up, swinging at him. Kneedy had his fists drawn back ready to hit Powell, but Fitzgerald prevented this.

Since this appeal presents only the sufficiency of the evidence to sustain the verdict, we quote the following excerpts from the record. Fitzgerald, proprietor of the poolroom, testified:

''I was in the pool hall on the night of January 4, 1941. Kneedy and Van had been in there all day in the afternoon and evening, and were there when I came back from supper. My closing time is twelve o'clock and I saw them at that time. They got into an argument about twelve o'clock. * * * I told them to get out. Kneedy said, 'We don't have to get out.' We then put them out. * * * After Van and Kneedy were put out the front door, I held it shut with my foot. Kneedy pushed it open. I saw this through the glass in the door. Kneedy was directly opposite me with his hands on the glass. Cook was standing

about where the two front doors divide. * * * As Kneedy pushed it open, Van hit Cook through the door and Cook fell to the floor. Just as soon as the door was opened Cook was struck. I then stepped outside and *both Van and Kneedy came at me with their fists doubled up, swinging at me.* * * * Mr. Kneedy was doing his part of it. Mr. Kneedy was standing there *with his fists drawn back ready to hit Mr. Powell* and I hit Mr. Kneedy then.'' {Italics supplied.)

McCollough, a National Guardsman who had lived in Webster City all his life, witnessed the affair. He testified:

''Van and Kneedy were both swearing. I heard Fitzgerald tell them they would have to get out * * * and then Powell told them they would have to get out. Kneedy replied, 'We don't have to get out.' Fitzgerald then came back and told them to get out and they still insisted they didn't have to do so. Fitzgerald then grabbed Kneedy and started for the door with him, and Powell grabbed Van and started with him toward the door. Powell and Van were three or four feet behind Kneedy and Fitzgerald. While Van was being put out he turned his head to the right, and said he would get even with them for throwing him out. * * * his head was turned toward both Cook and Powell. * * * Cook was struck immediately after the door was opened. After the blow was struck I went outside and saw Kneedy standing with his back to the west window and *with his fists drawn and raised.* * * * When Powell went out *Kneedy and Van had their fists drawn* ready to strike. * * * Kneedy gave no help to Cook and did not come back to see what was wrong. * * * Officer Weedman took Van down the street, and told me to come along because he wanted me to file the information against them. Kneedy and Powell came along behind. Kneedy called me back several times to tell me to keep out of it, and that I had better not go along. He said it would mean trouble for me, and he asked me if I didn't think Cook got what he had coming to him and he said *he would like to have got those other two guys also* [i.e. Powell and Fitzgerald]. * * * Kneedy offered no resistance when he was taken out other than to hold his weight back so as to be forced.'' (Italics supplied.)

Waggoner, a soldier in the Army, also was an eyewitness. He testified:

"Kneedy was being forced out, and didn't want to go but I didn't hear him say anything. The only thing I heard Van say was something about he would get even for being put out. After Kneedy and Van were put out and the door was closed they tried to get back in. * * * Cook was struck immediately after the door was pushed open."

Powell, the employee who escorted Van to the door, gave the following testimony:

"They were talking loud and using profane language * * * we asked them to go. * * * Kneedy said they didn't have to go. Van said the same thing. * * * Fitzgerald, Cook and I forced them out. * * * Van said, 'I will get even with you for this.' * * * After the door was opened, the blow was immediately struck. * * * I heard Calkins say to Van and Kneedy, 'You about killed a man. You had better stay and wait till the law comes.' They didn't say anything but just began walking away. Neither Van nor Kneedy stopped to see how badly Cook was hit."

Lee C. Groves gave the following incriminating testimony:

"I saw Kneedy in the Little Chicago Cafe about 1:00 or 1:30 Sunday morning, January 5, 1941. Kneedy came back to the counter where I was drinking coffee and said to me, '*We gave Glen Cook what he had coming tonight.*'" (Italics supplied.)

Appellant's witness Briggs testified: "At the last game of pool, Kneedy and Van were drinking quite a little." Kneedy admitted as a witness he had been drinking.

Sam Calkins testified:

"I seen Mr. Kneedy out in the street and Mr. Van had walked down beyond him, and I hollered 'Boys, don't run because this man in here is hurt pretty bad and you had better not try to run away,' and then I went back in the pool hall. Neither Kneedy nor Van came back when I hollered at them."

Appellant gave the following testimony before the grand jury:

"We were put outside the door and the door was shut and *I was resentful* about being forcibly put out and wanted to get back in so I put my hands on the door that opens and whether or not the pressure of my hands on the door opened the door or whether it was opened from the inside, I do not know, but when the door was opened Claude Van reached in and hit Cook and Cook fell to the floor." (Italics supplied.)

At the trial, appellant testified:

"I was resentful at the way I had been treated. Nobody touched me but Fitzgerald and I was resentful toward him."

Principal witness for appellant, aside from himself, was Briggs, whose home was in Dubuque. Van's home was in Waterloo and Kneedy lived in Webster City. Van and Briggs had come to Webster City together on January 4th. Briggs testified that he and Kneedy associated "a considerable amount of time. He rides around with me in my car once in awhile." Kneedy testified:

"Van, Briggs and myself had been together several times during the month prior to January 4. I was in Algona with Van."

Briggs gave an entirely different version of the attack on Cook than any other witness, including appellant himself. Briggs testified that Powell put Kneedy out and Fitzgerald merely gave some assistance. Briggs also said:

"Cook, just before he closed the door, took a swing with his right hand at Kneedy and said, 'Now stay out there you crooked sons of b——s.' Just at that time somebody hit Cook. He fell back and I could have picked him up in my hand."

Details of the injury to Cook from the blow need not be considered. Suffice to say that the blow knocked Cook prone on the marble floor, causing a wound on the back of his head which bled

profusely. He was unconscious for 35 minutes plus the time it took to transport him from the poolroom to his home. Different witnesses say he never appeared the same again. He died 24 days later. The cause of his death was a streptococcic throat infection. Cook's family physician, Dr. M. B. Galloway, said the injury from the blow could not have caused the throat infection but might have been a contributing factor in his death if it lowered his resistance.

Some of the above testimony is disputed. Much of it is not denied. In determining the issue before us it is necessary to refer only to the testimony which tends to support the verdict. It is neither our duty nor privilege to decide disputed fact questions. That is the function of the jury whose conclusion is binding upon us unless we are satisfied it is without substantial support in the evidence. State v. Graff, 228 Iowa 159, 174, 175, 290 N. W. 97; State v. Crandall, 227 Iowa 311, 318, 288 N. W. 85; State v. Brown, 130 Iowa 57, 65, 106 N. W. 379.

In overruling the motion to direct made at the close of the State's testimony, the trial judge, who also presided over the trial of Van, stated:

"The testimony shows that this defendant was not a mere passing bystander who happened to come along. It shows that he was a participant in the brawl from the very inception, and when the blow was struck he opened the door so that the principal, the man, Van, * * * could strike Glen Cook, as he did strike him. I haven't any difficulty whatever in holding under this evidence that the jury has a right to find that he was an accessory, and under our statute the equivalent of a principal in that assault. * * * Now, I think * * * the evidence is very persuasive as far as we have gone in this case. * * * I don't believe Mr. Van intended to kill Cook; but they both did intend to beat him up, I think * * * and they beat him up good and plenty; * * *. I see no reason why the question shouldn't go to the jury as to whether or not this man was a participant and an accessory, an accomplice, a co-conspirator, and a confederate, in that attack upon Mr. Cook."

Section 12895, Code, 1939, makes guilty as principals "all persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense, or aid and abet its commission, though not present." It is true that one who aids and abets must do so knowingly. State v. Miner, 213 Iowa 193, 195, 238 N. W. 594; State v. McCarty, 210 Iowa 173, 177, 230 N. W. 379; 14 Am. Jur. 842, section 111. The term "abet" includes knowledge of wrongful purpose. 1 C. J. S. 306; 22 C. J. S. 158, 159, section 88b; 1 Words and Phrases (Permanent Edition) 73.

In 14 Am. Jur. 830, section 91, it is said:

"It is sufficient to render a person guilty of aiding and abetting in a crime, such as felonious assault, if he entertains the felonious and malicious intent himself or if he aids and abets the assault with knowledge that the perpetrator thereof is actuated by such an intent."

To the same effect, see 22 C. J. S. 154, 157, section 87a; Annotation 16 A. L. R. 1045, 1046, and citations.

There can be little doubt of the sufficiency of the evidence to show that appellant aided Van in assaulting Cook. By opening the door, he enabled Van to strike the blow. The jury could properly find that the crime could not have been committed without appellant's assistance. We think the evidence sufficient also to support the finding that appellant acted with the requisite intent or knowledge of such intent on the part of Van.

We have repeatedly held that knowledge or intent is seldom capable of direct proof. It is usually inferred from the proven surrounding circumstances. State v. Van, 232 Iowa 34, 2 N. W. 2d 748, 749, and citations. Participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed. 22 C. J. S. 158, 161, section 88b; State v. King, 198 Iowa 325, 337, 197 N. W. 981; State v. Brown, 130 Iowa 57, 62, 64, 106 N. W. 379. A common purpose among two or more persons to commit a crime need not be shown by positive evidence but may be inferred from the circumstances surrounding the act and from defendant's conduct

subsequent thereto. 22 C. J. S. 155, 156, section 87a; State v. Carlson, 203 Iowa 90, 93, 212 N. W. 312.

The jury could have found that Van and Kneedy were close friends and that each regarded the other's presence as an encouragement and protection; that while they were being ejected Kneedy heard Van threaten to get even with Cook and Powell. Kneedy told the grand jury he resented being put out and wanted to get back in. But it was closing time, as Kneedy well knew. They had no legitimate purpose in re-entering and unlawfully sought to force their way back in. It is a reasonable inference that they had a common purpose to carry out Van's threat to get even with Cook and Powell. The doors to the pool hall contained large glass panels, and Kneedy and Van could see the positions of Cook, Powell, and Fitzgerald. It is significant that Van struck Cook instantly when Kneedy forced open the door a sufficient distance. It is reasonable to infer that the door was opened to permit Van to strike the blow. This was the conclusion of the trial court.

What happened immediately after Cook was knocked unconscious throws much light on appellant's participation in the attack on Cook. Both Van and Kneedy "came at" Fitzgerald with their fists doubled up, swinging. "Mr. Kneedy was standing there with his fists drawn back ready to hit Mr. Powell." McCollough saw Kneedy right after Cook was struck "with his fists drawn and raised." McCollough also testified that both Van and Kneedy had their fists drawn, ready to strike Powell. The common purpose of Kneedy and Van to assault Cook is shown by their joint attempt within a few moments to strike both Fitzgerald and Powell.

If appellant was a mere innocent bystander, it is somewhat strange he showed no interest in the extent of Cook's injury. Why did he ask McCollough to agree that Cook got "what he had coming to him"? Appellant's statement to McCollough that "*he* would like to have *got* those other two guys *also*," is an incriminating admission. If appellant was innocent, why did he threaten McCollough with trouble if this witness would not con-

ceal what he knew of the affair? Why did Kneedy boast to Groves, "*We* gave Cook what he had coming"?

█ There is another fundamental theory under which appellant might have been found guilty. Where two or more persons combine to accomplish an unlawful purpose, each is responsible for the act of another which is a probable consequence of carrying out the unlawful design even though the particular crime committed was not a part of that design. State v. Mc-Cahill, 72 Iowa 111, 117, 30 N. W. 553, 33 N. W. 599; State v. Munchrath, 78 Iowa 268, 278, 43 N. W. 211; State v. Pasnau, 118 Iowa 501, 504, 505, 92 N. W. 682; State v. Lyons, 202 Iowa 1195, 1197, 211 N. W. 702; 14 Am. Jur. 825, section 83; 22 C. J. S. 155, 156, section 87a; 1 Wharton's Criminal Law, 12th Ed., 343, 344, section 258; Annotation 16 A. L. R. 1043, 1047.

There is sufficient evidence from which the jury could have found that Van and Kneedy combined to accomplish the unlawful purpose of forcing their way back into the pool hall which they had been ordered to leave and from which they had been ejected. Kneedy partially carried that purpose into effect by pushing open the door which was being held shut by the proprietor. The attack upon Cook, who had assisted in holding the door shut, was a natural and probable consequence of attempting to carry out the unlawful purpose of forcing their entrance into the building.

The judgment is—Affirmed.

BLISS, C. J., and STIGER, SAGER, and HALE, JJ., concur.

MITCHELL, OLIVER, MILLER, and WENNERSTRUM, JJ., dissent.

MITCHELL, J. (dissenting)—I find myself unable to agree with the majority and respectfully dissent.

In an opinion handed down May 5, 1942, State v. Whisler, 231 Iowa 1216, 1219, 3 N. W. 2d 525, 527, this court said:

"We have frequently held that this court may reverse a criminal case, even though having some support in the evidence,

if the verdict is clearly against the weight of the evidence. State v. Carson, 185 Iowa 568, 170 N. W. 781, and cases cited.''

Although this is a criminal case, it is a very peculiar record, for there is little, if any, dispute in the facts. Kneedy himself volunteered, and was permitted, to tell the story to the grand jury.

Kneedy and Van had known each other for approximately a year and a half. While they were friends, they never had been engaged in any joint ventures. There is some evidence that Kneedy was at the pool hall that afternoon and evening. This is the evidence of Fitzgerald, the owner, but on cross-examination he admitted that Kneedy was there when he came back from his evening meal and he did not know what time that was. Kneedy says he went into the pool hall about 10 o'clock that evening. As far as I can see, it is not important just exactly what time he went there. Van was playing pool with a man named Johnson. There was an argument between Van, Johnson, and Kneedy. There was some profanity used, but the argument ended when Van admitted he was to blame and not Kneedy. This apparently was not the reason for their being asked to leave the pool hall. The reason was that the hour of midnight had arrived, when the pool hall was required to be closed.

It is true Van and Kneedy did not want to leave, but Fitzgerald, the owner, whose testimony is greatly relied upon by the majority, testified, I quote:

''I put Kneedy out alone taking hold of him by the back of his neck and on his arm. *He offered no resistance. He didn't swing and didn't hit a blow while I was putting him out, and I had no trouble with him then.* I don't know what the argument was about when I ordered them out. I had told them they would have to quit arguing or out they would go. I told them it was twelve o'clock and they were still arguing and they would have to get out.'' (Italics supplied.)

After Van and Kneedy were put out, they started back into the pool hall. There is not one word of evidence, not even a claim on the part of the prosecution, that there was any talk

between Van and Kneedy after they were put out of the pool hall. They started back in immediately. Kneedy was pushing against the door, and, as the majority say, the blow was struck instantly as the door was opened. The sole and only thing that Kneedy is guilty of, as I read this record, is pushing against the door.

It is not claimed that Kneedy hit Cook nor is there any claim made that Kneedy hit or attempted to hit any person inside the pool hall.

Great reliance is placed in the majority opinion on the attitude of Kneedy immediately after the blow was struck and later in the evening. Part of the evidence of the witness Fitzgerald is quoted. I would like to insert a part of that evidence that follows the majority quotation. The majority quote:

" 'I then stepped outside and both Van and Kneedy came at me with their fists doubled up swinging at me.' "

Then Fitzgerald testified, I quote:

"Powell then came through the door and hit Van. Kneedy seemed ready to hit Powell and I hit him. I then went back inside because there was nobody to take care of my business."

No other witness testified that Kneedy even attempted to hit any other person, inside the pool hall or outside, and it will be noted that Fitzgerald does not say Kneedy hit him. In fact, Fitzgerald hit Kneedy.

The only charge made against Kneedy is that he aided and abetted Van, who was the man that hit Cook. The distinguished trial court in submitting the case to the jury, said:

"* * * if you find beyond a reasonable doubt that the defendant was knowingly concerned in the commission of the alleged offense, and knowingly aided and abetted the same, you can still convict him of assault with intent to inflict great bodily injury only upon a finding beyond a reasonable doubt that he aided and abetted the assault with the intent on his own part to inflict a great bodily injury upon the said Cook."

I have no fault to find with this instruction. My objection is that there is no evidence in the record that Kneedy knowingly aided and abetted Van, and as I understand the law, knowledge is one of the necessary elements of the crime charged. In the case of State v. McCarty, 210 Iowa 173, 177, 230 N. W. 379, 381, this court said:

"* * * knowledge is a necessary element to constitute an accessory."

The majority recognize this. I quote:

"It is reasonable to infer that the door was opened to permit Van to strike the blow."

They do not say what it is that in their judgment justifies such an inference, but I can readily see why the majority state this, because the opening of the door was the only part that Kneedy played in this unfortunate affair. Then the majority say:

" 'The common purpose of Kneedy and Van to assault Cook is shown by their joint attempt within a few moments to strike both Fitzgerald and Powell.' "

The majority, confronted with the necessity of showing some common purpose between Kneedy and Van to assault Cook, base it upon the claim that there was a joint attempt within a few moments to strike both Fitzgerald and Powell. Not a witness testifies, as I read the record, that Kneedy ever attempted to hit Powell or any other person. The majority base their statement upon the testimony of Fitzgerald and all that Fitzgerald testified to was:

"Kneedy seemed ready to hit Powell and I hit him."

Not a single witness testified that Kneedy ever attempted to hit Cook or that he had any purpose or idea of assaulting Cook. In fact, the uncontradicted record shows that Cook was a friend of Kneedy's.

Great reliance is placed upon the testimony of the witness

Groves in regard to a conversation he had with Kneedy some hours after the affair happened, but the thing that seems to me to answer all of these charges made in the majority opinion is the fact that on the night this occurred, no one at that time, not a single one of the witnesses nor the law-enforcing officers of Hamilton county, made any charge against Kneedy. He was not even asked to go to the police station. No charge of any kind was made against Kneedy until 22 days later, when Cook unfortunately died from a streptococcic infection of the throat, which, in the judgment of the distinguished trial court, was in no way connected with the striking of Cook by Van.

As I read this record, there is no evidence of any knowledge upon the part of Kneedy as to what Van was going to do on that evening when they started back into the pool hall; no evidence to show that this appellant either aided or abetted Van or was Van's accomplice in connection with the blow which Cook received from Van. In fact, there was no way in which Kneedy might have known that Van intended to strike Cook. Men should not be convicted of offenses on mere inferences. There should be substantial evidence. The verdict is clearly against the weight of the evidence, and this court, in my judgment, should reverse the case.

I am authorized to state that JUSTICES OLIVER, MILLER, and WENNERSTRUM join in this dissent.