State of Iowa, Appellee, v. Frank Thompson, Appellant.

No. 47153.

(Reported in 33 N. W. 2d 13)

June 15, 1948.

Stuart & Stuart, of Chariton, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, Carroll O. Switzer, County Attorney, and Joseph Z. Marks, Assistant County Attorney, for appellee.

Hays, J.—Defendant, Frank Thompson, was convicted in the Des Moines Municipal Court of the charge of cruelty to animals, in violation of section 717.3, Code of 1946. From a judgment in accordance therewith, he has appealed.

Appellant's counsel apparently has entirely disregarded Rule 344(a)(4), Rules of Civil Procedure, in the preparation of his brief and argument and only by an examination of his

reply brief and argument do we find the propositions relied upon for a reversal. This being a criminal case, we are reluctant to penalize appellant for his counsel's shortcoming, but again we wish to remind counsel in particular, and the bar in general, of the necessity of compliance with our Rules.

The sole question presented by appellant is the sufficiency of the evidence to sustain the conviction. Appellee has submitted five propositions in an attempt to meet whatever theories appellant may have had when his brief and argument was filed, one of them being the sufficiency of the evidence and we confine this appeal solely to that proposition.

The record does not contain the information under which appellant was convicted, however, from a statement to the trial court by appellee's counsel, we understand the charge is cruelty to animals in that he supplied insufficient water, food and shelter for dogs in violation of section 717.3, Code of 1946, which section, so far as material here, provides:

"If any person torture * * * any animal, or unnecessarily fail to provide the same with proper food, drink, shelter, or protection from the weather * * * by which unjustifiable pain, distress, suffering, or death is caused or permitted to any animal or animals, whether the acts or omissions herein contemplated be committed either maliciously, willfully or negligently * * *" he shall be punished as therein provided.

There is no dispute as to the legal questions involved. All parties recognize the elementary rule that a verdict of guilty, substantially supported by the evidence, will not be set aside on the grounds of insufficiency thereof, but will only be set aside where evidence is so utterly wanting that it cannot be sustained. State v. Schmidt, 239 Iowa 440, 30 N. W. 2d 473; State v. Wilson, 234 Iowa 60, 11 N. W. 2d 737; State v. Hiatt, 231 Iowa 499, 1 N. W. 2d 664; State v. Crandall, 227 Iowa 311, 288 N. W. 85; State v. McKenzie, 204 Iowa 833, 216 N. W. 29; State v. King, 198 Iowa 325, 197 N. W. 981.

The record shows the following facts: Appellant, who resides in Des Moines and is employed by the Campbell Heating Company, has for the past year been picking up stray, and

unwanted dogs, and shipping them to a serum company in Omaha, Nebraska. On the date in question and for about three months prior, appellant rented a vacant tract, largely a weed patch, in southwest Des Moines, where he kept these dogs in pens until sold locally or shipped to Omaha. On July 24, 1947, he had approximately thirty-eight dogs thus restrained. Some of them he had had about two months, while at least nine of them were picked up a day or so prior to July 24. They were mongrels of various size, sex, color and age. The shelters were of different size and character—some were cages on stilts with board floors; some had wire netting on the floor (the ground) and sides with boards on the top. They varied in size from 2 by 6 feet to 6 by 8 feet. In a shed near by was the hide and bones of a dead hog, and in another place the bones of a dead calf. There were about ten pens in all containing from thirteen dogs to one or two.

On July 24, these dogs were taken by the Animal Rescue League. Various witnesses testified for the State. In all instances the only time they observed these dogs was on the day in question. The dogs were described as very thin; they acted quite hungry; in very bad condition, and without question they had mange and some had distemper. At the time the various parties visited the pens, it was in the heat of the day. Few if any of the pens had water in them and what food, if any, consisted of dried buns and corn. Some of the water containers were too high to be used by the small dogs in the pens. All of the witnesses testified as to the dogs' tongues being out and their panting for breath, that they seemed wild and ferocious, and the pens were dirty. In an old barrel was a bitch with young puppies, with little protection from the sun, while in the shed was another litter of pups, but in both instances the mothers were not restrained in any manner.

Defendant testified that he always fed and watered the dogs twice daily. In the early morning before work and the late evening after work. A neighbor testified to seeing him about the pens frequently in the morning and evening. At the time the dogs were taken by the Animal Rescue League, pictures by a newspaper photographer were taken of the various pens

and dogs. These photographs were offered in evidence by the State and are as important in determining the question before us as are the statements of the various witnesses.

The charge is that because of the manner in which these dogs were kept and cared for, they suffered unjustifiable pain, distress, suffering or death. Some of the witnesses for the State are breeders of fancy dogs. Their opinions as to the condition of the shelters and the dogs are under a comparison with their kennels and dogs. The superintendent of the Animal Rescue League and his wife state that they do not consider the shelters sufficient. Beyond the suffering from distemper and mange, which occurs in the best of families, there is no evidence of unjustifiable pain or distress upon the part of the dogs other than a panting and the hanging out of tongues. The day was extremely hot. The observations were made during the heat of the day, and, while water may have been desirable for them at that time, its absence does not show suffering. The dogs were thin and appeared hungry, yet it must be remembered that these dogs were strays and used to visiting the garbage cans in the alleys for their subsistence.

There remains the photographs. As to the admissibility thereof, and their value in determining fact questions, we quote from State v. Matheson, 130 Iowa 440, 443, 103 N. W. 137, 138, 114 Am. St. Rep. 427, 8 Ann. Cas. 430, quoting from Udderzook v. Commonwealth, 76 Pa. 340, 353, wherein it is said that photography "has become a customary and common mode of taking and preserving views as well as the likenesses of persons, and has obtained universal assent to the correctness of its delineations. We know that its principles are derived from science; that the images on the plate, made by the rays of light through the camera, are dependent on the same general laws which produce the images of outward forms upon the retina through the lenses of the eye. The process has become one in general use, so common that we cannot refuse to take judicial cognizance of it as a proper means of producing correct likenesses." Again, it is not the condition of the shelters, nor the quality of the food nor the general surroundings which constitutes the crime of cruelty to animals, but the effect thereof

upon the animals. Under this entire record, not only do we fail to find substantial evidence of the cruelty contemplated by the statute in question, but in the light of the photographs there is a total lack of evidence of unjustifiable suffering upon the part of the dogs.

The State has failed to sustain the burden of showing beyond a reasonable doubt an "unnecessary failure to provide proper food, drink or shelter" or "unjustifiable pain, distress, suffering, or death" as a result thereof.

The cause is reversed with directions to dismiss the complaint.—Reversed.

MULRONEY, C. J., and OLIVER, BLISS, WENNERSTRUM, MANTZ, and SMITH, JJ., concur.

GARFIELD and HALE, JJ., dissent.

GARFIELD, J. (dissenting)—I respectfully dissent.

As the majority indicates, defendant's opening brief contains no statement of errors relied on for reversal as required by Rule 344, Rules of Civil Procedure, made applicable to this appeal by section 793.17, Code, 1946. We would be justified in holding defendant has presented nothing for our consideration. See State v. Briggs, 207 Iowa 221, 222 N. W. 552, and citations; State v. Perkins, 208 Iowa 1394, 227 N. W. 417; State v. Schenk, 236 Iowa 178, 186, 18 N. W. 2d 169, 173. This case is not like State v. Clay, 222 Iowa 1142, 1144, 271 N. W. 212, and some others involving a grave offense and severe penalty in which we are inclined to overlook lack of compliance with our Rules.

Aside from the above, I think the judgment has sufficient support in the evidence. Of course we must view the testimony in the light most favorable to the prosecution. State v. Hill, 239 Iowa 675, 32 N. W. 2d 398, and citations; State v. Anderson, 239 Iowa 1118, 33 N. W. 2d 1, and citations; State v. Persons, 114 Vt. 435, 439, 46 A. 2d 854, 857. It is necessary to refer only to the evidence which tends to support the judgment. State v. Kneedy, 232 Iowa 21, 27, 3 N. W. 2d 611, 615, and citations; State v. Hill, supra.

The crime charged consists of unnecessarily failing to provide any animal "with proper food, drink, shelter, or protection from the weather * * * by which unjustifiable pain, distress, suffering, or death is caused * * * whether the acts or omissions * * * be committed either maliciously, willfully, or negligently." Section 717.3, Code, 1946.

This statute should be construed so as to effectuate the legislative intent and attain the practical object of such laws. See 3 C. J. S., Animals, 1189, section 67. The words "unnecessarily" and "proper" are to be understood in their ordinary sense. State v. Persons, supra, 114 Vt. 435, 437, 46 A. 2d 854, 855; Commonwealth v. Curry, 150 Mass. 509, 23 N. E. 212. "Proper" means "fit, suitable, appropriate." Miller v. Cedar Rapids Sash & Door Co., 153 Iowa 735, 741, 134 N. W. 411, 415, and citation. The majority seems to ignore the statutory requirement of *proper* food, drink and shelter.

There is ample evidence defendant unnecessarily failed to provide at least some of these dogs "with proper food, drink, shelter, or protection from the weather." Proof that such failure caused "unjustifiable pain, distress, suffering, or death" is perhaps less clear. However, courts have held in effect it is common knowledge that lack of proper food, drink or shelter causes distress or suffering in animals. See State v. Persons, supra, 114 Vt. 435, 439, 46 A. 2d 854, 857; Moore v. State, 183 Ind. 114, 107 N. E. 1; Commonwealth v. Curry, supra. A great deal of evidence should not be required to prove this fact.

Defendant collected unwanted dogs and sold about six each week to a serum company in Omaha and nearly as many in Des Moines for pets. The animals were kept in about ten make-shift pens or cages in a weed patch near defendant's home. Defendant says he fed and watered the dogs before he went to work at 6:30 each morning and again after he returned from work in the evening. No provision was made to furnish either food or drink at any other time.

On July 24, 1947, several persons interested in either the Animal Rescue League or the Humane Society looked at the pens and the 40 dogs kept in them. They testified as to their observations. The largest pen was about 7 by 8 feet with solid

sides 5½ feet high. It contained 11 dogs. Except for a little water covered with scum in one of the pens, there was no water in any of them. The sides of the single container with water in it were so high the smaller dogs were unable to reach the water.

Mr. Koss, president of a construction company, testified:

"The dogs were being held in a very deplorable condition. * * * They were old barrels that had been cut in half and some with boards around the side so that the air couldn't get through and one or two were elevated pens. * * * Then there were some very small cages in which dogs were kept. They could hardly stand up or lie down. * * * There was feed corn on the ears which a dog doesn't eat. There were old stale buns and pieces of bread. It looked as if the dogs didn't have food but had had garbage dumped in at sometime * * * I saw the dogs that were shipped out of town. They were in a deplorable condition. They were in a small cage, about 6 by 5 feet and couldn't stand up or sit down. There was water in one end of the cage but * * * the dogs at the far edge couldn't get over to the water."

Mr. Winsell, superintendent of the Animal Rescue League, testified he had handled about 50,000 dogs in the sixteen years he has held such office:

"I am acquainted with their needs of shelter and food and drink. Q. *In your opinion were they properly sheltered at that place?* A. *I would say by all means, no.* In my opinion there was not sufficient water or facilities for water and they were also dirty. I took the dogs to the Animal Rescue League and had an opportunity to observe their condition. There were a lot of them that were awful sickly. The bars on our kennels are 2¾ inches apart and some of the puppies were so poor they would crawl right through those bars. Q. What did they seem to be suffering from? A. Quite a few of them had distemper. * * * Q. *Were the dogs suffering from lack of sufficient water?* A. *I would say they were.* Q. *Were there various of the dogs suffering from malnutrition?* A. *I would think so from the*

*looks of them.* I didn't see anything for them to eat but some corn. Q. Do dogs eat corn? A. They will if they are hungry enough. Q. Is that proper dog food? A. *No, it is not proper dog food.* Some dogs will eat it. It won't hurt them but it is not proper dog food. Q. Were there any evidences they had been properly fed over the week previously? A. I couldn't say there was, no. In my opinion, they were improperly fed. Since that time I have had the care of these dogs. * * * Several of of them died from distemper. Probably that is what took all of them."

Mrs. Winsell, assistant superintendent of the Animal Rescue League for sixteen years, told of her observations on the morning of July 24 when she was called to the scene:

"I saw a lot of dogs in very bad condition. * * * the pens were just dilapidated wire that looked like they might have picked it up out of the junk and put it together with old tin sink covering * * *. There was one pen like a chicken coop turned over some dogs. This was about a foot and a half high and I would say there were three or four medium sized dogs in it. I wouldn't say they were able to stand up in it. They could lie down but if they sat up their back would touch the wire. There was an old dilapidated box * * * they had a dog tied to this and several puppies around it. I would say this was about 2½ feet across. I would say these pens constituted improper shelter for the size and number of dogs that were there. Q. From your experience with dogs *would you say they had been properly fed?* A. *No, I don't think they had.* * * * Q. From your observation of those dogs, did it appear they had been receiving a proper amount of water? A. I wouldn't think they had. This was a very hot day and I wouldn't say the pens allowed them to get fresh air. One little place was in the shade but the other pens were out in the boiling hot sun. Some of them had tin roofs that made it all the hotter.

"The Court: Did you see any suffering among the dogs when you first went out there? A. Yes, they all had their tongues hanging out for wanting water and from all the heat.

"The Court: Did you see any food? A. No, nothing only some hard buns and there were some ears of corn and I did see just a potato * * *."

The secretary of the Humane Society testified to his observations when called to defendant's place about 2 p.m.:

"An oil barrel facing the east with the sun from the west beating hot on it and 4 or 5 little puppies and the dog in it was the thing that attracted my attention."

This witness also saw at least 4 dogs in a small pen probably 2 by 5 feet. Some of the pens were so located and built it was impossible for air to get to the animals.

"Some of the dogs were irritable and barking and nervous. Others were apparently not too well * * * Yes, they were in need of water. * * * their tongues out and gasping somewhat for breath because of the heat."

Sonderleiter, who has raised dogs for twenty years, told what he observed on the afternoon of July 24 and the following day:

"In one of the hog houses there were 2 or 3 puppies and a mother and a dead calf—and the stink, you couldn't hardly stand the odor. * * * *These dogs were in their own filth approximately two or three inches thick * * * I would say they* [pens] *had not been cleaned for a good many months.* * * * The little dogs couldn't possibly drink from the pan if it had water. * * * they were all skinny as rails. * * * pen 'C' was so low the dogs couldn't stand up in it. * * * *The dogs were very thin, their tongues hanging out for lack of water and they were just skeletons you might say.* * * * The dogs showed evidence of having been improperly fed. Q. What evidence was there the dogs had not been properly fed? A. The evidence of the food that had been put in the cages for them to eat and the condition of their eyes, their eyes were moist, all showed signs of distemper and like a starved animal. Q. And from their condition you were able to determine they had not been fed properly over a period of time? A. Yes. I made a

trip back the next day. * * * *I saw skeletons of one dog that had not been dead possibly over a day or so and about three other carcasses.* They were back of these pens, I would say about three feet in this column of bushes."

Defendant did not deny Sonderleiter's testimony regarding the amount of filth or the dead dogs.

Mrs. Diltz, who has raised dogs for about fifteen years, testified:

"As I got possibly as far as this courtroom is long from the place it began to smell and in the hot sun were these dogs. Some with a sheet of tin over them and some open to the sun. There was a little female with several baby puppies, looked like they had been born about that day in a hot tin barrel with no bedding, nothing over them but the tin. There was no water in the barrel. * * * *Some of these dogs were sick and their eyes were mattering.* One little puppy could just open its eyes half way. *It looked very sick, the others were scrawny and droopy and were panting and jumping,* some of them jumping to get out. * * * Q. From their physical condition were you able to tell whether or not they had been properly fed? A. Only that they acted quite hungry and the evidence, if you call it evidence, that was there, field corn and a couple of dry buns, bones that were dried up lying in filth. *I wouldn't call that properly feeding any dog.* Some of them were very thin. I would say they showed evidence of not having sufficient water."

Mrs. Goforth saw the dogs and said she thought they were in very poor condition and very thin. A neighbor testified she had seen defendant occasionally down by the pens "for 5 or 10 minutes a day during the morning and night but not every day."

It is unnecessary to summarize the testimony further. Enough has been set out to demonstrate there is competent evidence that defendant neglected to provide at least some of these dogs with *proper* food, drink, shelter or protection from the weather and pain, distress, suffering or death resulted therefrom. As previously indicated, it is unnecessary to refer to

defendant's testimony. See State v. Kneedy, supra, 232 Iowa 21, 27, 3 N. W. 2d 611, 615, and citations. Defendant denied only some of the State's evidence. His testimony is without corroboration. Of course the lower court was not compelled to accept it.

The majority observes, "Some of the witnesses for the State are breeders of fancy dogs. Their opinions as to the condition of the shelters and the dogs are under a comparison with their kennels and dogs." It is true Sonderleiter and Mrs. Diltz are breeders of pedigreed dogs. The remainder of the majority's statement is unwarranted. Likewise is its observation "these dogs were strays and used to visiting the garbage cans in the alleys for their subsistence."

The majority states "pictures * * * were taken of the various pens and dogs" and intimates these photographs are fatal to the State's case. Four photographs are in evidence. One shows the crate in which six dogs were shipped to the Omaha serum company. The dogs do not clearly appear. The principal inference to be drawn from this exhibit is that the crate is too small for so many dogs. One of the other photographs is an outside view of the largest pen and two small cages adjacent to it. It clearly shows the makeshift character of the pen and cages but discloses nothing as to the condition of the dogs. One of the other two photographs shows an inside corner of the largest pen and 9 of the 11 dogs kept therein. Only the heads of the other 2 animals appear. The remaining photograph is also an inside view of the largest pen showing 5 of the same 11 dogs there confined.

I can see nothing damaging—much less fatal—to the State's case in these photographs. They support the witnesses' descriptions of the pens and cages and fall far short of making unbelievable their testimony as to the condition of the animals. Further, the pictures show less than half the various pens or cages and only one fourth the 38 to 40 dogs kept by defendant. None of the half barrels is shown, nor the oil barrel containing the female and her young puppies. It is reasonably to be inferred that the smaller pens or cages not shown in the photographs afforded less proper shelter than the largest pen and

that the animals there restrained were in more distress than those in the largest pen shown in the photographs.

As tending to support this dissent see Commonwealth v. Curry, supra, 150 Mass. 509, 23 N. E. 212; State v. Persons, supra, 114 Vt. 435, 46 A. 2d 854, 857.

I would affirm.

HALE, J., joins in this dissent.